662 A.2d 333

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,

v. JOSEPH HARRIS, DEFENDANT–APPELLANT.

Argued October 25, 1994—Decided July 12, 1995.

526

532

*Mordecai Garelick* and *Marcia Blum,* Assistant Deputy Public Defenders, argued the cause for appellant (*Susan L. Reisner,* Public Defender, attorney).

*Joseph Connor, Jr.,* Assistant Prosecutor, argued the cause for respondent (*W. Michael Murphy, Jr.,* Morris County Prosecutor, attorney).

*Robert E. Bonpietro,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Deborah T. Poritz,* Attorney General, attorney).

The opinion of the Court was delivered by

O'HERN, J.

A Morris County jury convicted defendant, Joseph Harris, of the murder of R.E., and of other offenses against R.E., his wife, I.E., and their two daughters. (Because this case involves sexual assault of juveniles, we do not use actual names. *N.J.S.A.* 2A:82–46a. To avoid dehumanizing the issues, we will use the assumed names of Ron and Ilene Ellison for the adult victims.) In a sentencing proceeding, the jury also found the presence of statutory aggravating factors that established death-eligibility. After considering the statutory aggravating and mitigating factors, the jury determined that defendant should be sentenced to death. For the non-capital convictions, the court imposed two consecutive life sentences and eighty years of consecutive sentences with a ninety-year period of parole ineligibility.

The principal claims raised in defendant's appeal are: (1) a selective capital prosecution of this case occurred after defendant rejected a plea offer with a non-capital sentence; (2) the trial judge incorrectly charged the jury on the form of murder that is death-eligible under the principles of *State v. Gerald,* 113 *N.J.* 40, 549 *A.2d* 792 (1988); (3) the trial judge failed to inform the jury that it could unanimously find defendant guilty of murder even if it did not agree on the form of murder (intentional or serious-bodily-injury (SBI) murder); (4) the trial judge incorrectly

charged the jury that it should not consider the diminished-capacity defense based on mental disease or defect until after it had rejected defendant's evidence of insanity; and (5) the trial judge improperly denied an affirmative defense to robbery based on a claim of right to funds in the possession of the murder victim. We find that those and other claimed errors did not taint the trial. The convictions are affirmed.

## I

For purposes of this appeal we draw generally upon defendant's statement of facts. In 1984, defendant invested $10,000 with Ron Ellison's firm, an investment company specializing in precious metals and coins. Defendant received dividend checks for the first few months thereafter. Eventually, however, the monthly checks became smaller and payments finally stopped. The company went out of business in 1985. Defendant wanted his $10,000 investment back. He visited the company offices and telephoned several times, attempting to talk to Ellison about the return of his money. Defendant thought that Ellison was avoiding his obligations to him.

Ellison and his wife lived with their two daughters, ages seven and nine. On November 15, 1988, Harris wrought his frightful revenge. On that date, it was after 8:00 p.m. when Ilene Ellison returned home from work to a night of horror. The front door was locked but it was opened by a man dressed in black, his face covered by a mask. He struck her and told her that her family was upstairs and that if she did what he told her to do nobody would get hurt.

Upstairs she found her husband and her two daughters handcuffed, blindfolded, and seated on the bed. He handcuffed and blindfolded Mrs. Ellison. Defendant repeatedly asked for money. Mrs. Ellison gave him $700 from her purse. He was not appeased. Defendant raped Mrs. Ellison and her two children.

Mrs. Ellison managed to loosen her blindfold and could see defendant walking around. She observed that he wore a mask

and surgical gloves. After continuous demands for more money, he raped Mrs. Ellison again and warned her and the children that if he saw anything in the newspapers about what occurred he would come back to get them.

After defendant left the room, Mrs. Ellison heard a sound like a gun being loaded. She heard her husband say to defendant, "I'll take you downstairs. * * * I have coins downstairs." Mrs. Ellison saw a gun in the master bedroom on the floor, which she kicked under the bed. She then heard her husband outside screaming, "he's going to kill me." Unable to open the window because of her handcuffs, Mrs. Ellison broke a window with the back of her hand. She screamed to a neighbor walking his dog outside. The neighbor called the police. Defendant returned upstairs and tried to force his way back into the bedroom. Because Mrs. Ellison had barricaded the door with a dresser, he was unsuccessful.

Upon arrival, the police found Ellison's body in the backyard. He was lying face down on his stomach. He had blood on his neck and shoulders. A bullet fell from the wound when the medical examiner moved the body. An autopsy report showed that Ellison had died from a bullet that entered the back of his neck on the left side, cutting the spinal cord and disconnecting the brain from the rest of his body. The State's pathologist testified that the victim probably was shot while he was on the ground.

A black hood with an opening for the eyes was found on the floor of the den. In addition, the pistol that Mrs. Ellison had kicked under the bed in the master bedroom, two pistol magazines, a box of ammunition, a flashlight, and a syringe and its plastic wrapper were also found. Two days later, a .22–caliber bullet shell was found in the yard adjacent to the Ellisons' backyard.

In October 1991, almost three years later, defendant was arrested in connection with unrelated killings of four postal workers in Bergen County. His home was searched. That search disclosed handcuffs and a flashlight like the one found in the Ellisons' home.

Syringes found in the search had markings similar to the one found at the Ellison house. Two newspaper articles on the Ellison homicide and two snapshots of defendant in Ninja attire, armed with a martial-arts throwing star and a Ninja sword were discovered. The search produced two undated letters written by defendant. In both letters defendant calls himself a "warrior" likely to die "in combat" and "with great honor." One note, which is fairly brief and concerns Ron Ellison, has a postscript warning that after defendant died in combat he "might return as a ghost." In the face of that evidence defendant could not realistically deny that he killed Ron Ellison. His principal defenses were insanity and diminished capacity.

· Defendant's life was troubled. He was born in 1956 to an inmate of the State Women's Prison in Clinton, New Jersey. He was taken from his mother at the age of two months and given to his aunt and uncle. Defendant had hardly any contact with his mother and did not meet his father until he was eleven years old. He began to believe that he was cursed because he was born in prison and rejected by his parents. He did graduate from high school and served in the United States Navy. He attended classes for one semester at a local community college.

During his childhood, defendant began to fantasize. He had an imaginary friend and drew guillotines, swords, and guns. At the age of nine or ten he began to hear the voice of an Indian Chief. Eventually, however, the dominant voice defendant began to hear was that of a Ninja spirit, a fierce warrior whom defendant believed had been with him throughout his life. "Ninja" describes a member of a class of feudal Japanese warriors who were highly trained in the art of stealth. *Commonwealth v. Hudgens*, 400 *Pa.Super.* 79, 582 *A.*2d 1352, 1355 n. 9 (1990). Daimyos, the Japanese feudal lords, frequently employed Ninjas as spies and assassins because of their specialized training. *Ibid.* The Ninja costume is black and similar in style to a karate outfit, but it includes a black hood. *Id.* 582 *A.*2d at 1355 n. 7. Defendant claimed that this Ninja spirit directed him to go to Asia to fulfill

his prophecy. He enlisted in the Navy with the understanding that he would be stationed in Asia. After serving two years on an aircraft carrier in the Navy, he received a general discharge for failure to attend to his duties.

In November 1981, he began to work at the post office in Ridgewood, New Jersey, and remained there until May 1990. At this job he claimed to experience discrimination as an African–American. Believing that he needed to be able to defend himself, he took up karate. Defendant occasionally arrived at work dressed in black, an imitation of Ninja garb, or in a military camouflage outfit, and performed martial-arts maneuvers before fellow employees. His co-workers described his behavior as "irrational," "odd," and "weird."

## II

1. Was the prosecutor's decision to seek the death penalty after offering a plea to a life sentence an abuse of discretion, resulting in the wanton and cruel imposition of the death penalty in violation of defendant's constitutional rights?

In April 1993, during jury selection, the prosecutor offered a plea agreement to defendant pursuant to which the prosecutor would seek only a life sentence. Defendant claims that the prosecutor thereby announced his view that the death penalty was inappropriate and excessive in his case. When defendant tore up the executed plea in an emotional outburst moments before he was scheduled to enter the plea, the State continued to trial with a capital case. Defendant contends that he was subjected to a sentence of death rather than life imprisonment because he is mentally ill. Defense counsel does not claim that the State's initial decision to make this a capital prosecution was based on unsupported aggravating factors. Instead, they claim that an error lies in the State's reversal of its decision to prosecute his case as a non-capital case solely because the mentally ill defendant did not enter the plea as negotiated.

We have recognized the potential for arbitrariness in prosecutorial decisionmaking with respect to capital cases. In *State v.*

*McCrary,* 97 *N.J.* 132, 141, 478 *A.*2d 339 (1984), we acknowledged the significant consequences that flow from a decision to seek a death sentence and found ourselves persuaded "that some judicial scrutiny of prosecutorial charging [was] necessary." Our stated goal was "to effect only a minimal intrusion into this area of prosecutorial discretion" in light of the "broad discretionary powers" historically exercised by prosecutors in determining charges. *Id.* at 142, 478 *A.*2d 339. In *State v. Koedatich,* 112 *N.J.* 225, 252, 548 *A.*2d 939 (1988), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989), we noted that *Gregg v. Georgia,* 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859 (1976), holds that "the federal Constitution does not require limits on prosecutorial discretion beyond the aggravating factors outlined in the statute." We looked beyond that requirement, however, and found that "the New Jersey Constitution * * * mandates consistency and reliability in the administration of capital punishment." *Id.* at 251, 548 *A.*2d 939 (citing *State v. Ramseur,* 106 *N.J.* 123, 190, 524 *A.*2d 188 (1987)).

As we have stated:

The critical question in assessing prosecutorial discretion is what standards are applied to move a case from death-possible to death-eligible status. * * *

* * * [T]here are a myriad of reasons why a prosecutor handles different cases differently, *such as the willingness of a defendant to plead guilty,* the strength of the State's case, a defendant's cooperation in the State's case against a co-defendant, the relative weight of the statutory aggravating and mitigating factors, the availability and relative credibility and persuasiveness of witnesses, and the resources of the county prosecutor's office * * *.

[*Id.* at 256, 548 *A.*2d 939 (emphasis added).]

In applying those principles, we do not find that this prosecution evokes the type of cruel and unusual punishment or arbitrary misuse of prosecutorial power that concerns us. Defendant's mental impairments did not serve as the basis for his exposure to the death penalty. Rather, the prosecutor's original decision, to proceed with the trial of the matter as a capital case, continued to be appropriate when defendant chose not to plead. Obviously, defendant's mental capacity was to be a contested issue in the trial. Only a guilty plea could avert revisiting the catalog of

horrors suffered by this family. (Ultimately, the two minor children were not forced to testify at the trial because defendant stipulated that they would testify that they had been sexually assaulted.) In addition, the guilty pleas in Morris County could have become aggravating factors in subsequent proceedings against defendant in Bergen County.

We cannot say that the prosecutor abused his discretion in continuing with the capital trial of this matter. This case is not like *State v. Jackson*, 128 *N.J.* 136, 607 *A.*2d 974 (1992), in which the prosecutor changed course in midstream. In this case it was defendant who caused the change in the course of the proceedings. Defendant had not been declared incompetent to stand trial. Defendant's claim of insanity did not compel the prosecutor to withdraw the notice of aggravating factors. Therefore, the prosecutor's decision to pursue a capital prosecution was not an abuse of discretion.

2. Did the trial court err in refusing to dismiss jurors for cause, thereby depriving defendant of his full allotment of peremptory challenges?

■ Before us, defendant focused his appeal on two jurors, Arlene P. and Laura J. The test that we have adopted for juror disqualification in *State v. Ramseur, supra*, 106 *N.J.* at 255–56, 524 *A.*2d 188, is whether the jurors' views on the death penalty would have substantially interfered with the performance of their duties in accordance with the court's instructions and the law.

Defense counsel initially requested that the court remove juror Arlene P. from the panel on the ground that she was an "automatic death penalty" person. Counsel also sought dismissal for cause based on the juror's skepticism about psychiatric testimony. When asked if she could think of any case in which the death penalty would not be appropriate for an individual convicted of murder, she responded, "I can't. No." Later, in response to rehabilitative questions posed by the prosecutor asking if she were the kind of person who would vote for the death penalty automatically, she replied, "I would have to weigh and measure."

Defendant argues that this kind of forced rehabilitation encouraged the juror to shield her natural views. We have reviewed the colloquy between the prosecutor and the witness and the court's questions. We are satisfied that the court correctly held that the witness' views would not have substantially interfered with her ability to decide a capital case. The court concluded that her inability to give an example of a case in which the death penalty was inappropriate occurred simply because "she couldn't think of a situation at this time."

The court did not rigidly force jurors' responses into a series of "yes" or "no" answers. It gave great leeway to counsel in the *voir dire* process. The court and counsel posed various hypotheticals to assess the jurors' attitudes.

More troubling were Arlene P.'s answers to questions about psychiatric testimony. When asked her opinion of such testimony, she said: "I don't think it's fair. I—, I—." She explained that she thought the use of such testimony was fair "[i]f the psychiatrist was honest * * *." The most that she said was "I guess it wouldn't be a problem. It's an—it probably wouldn't be a problem." The court asked her if she would be able to make a determination "as to that particular witness's testimony automatically." Defense counsel characterizes that as asking whether you believe in apple pie, the flag, and motherhood. Even the prosecutor was concerned that the court's questions could not "necessarily cure all the concerns that [defense] counsel raised," but the court refused to dismiss Arlene P. for cause because of her candor in expressing skepticism about psychiatric evidence.

We have required that trial courts permit a full opportunity to ask prospective jurors about their attitudes toward insanity and mental-health defenses. *State v. Moore*, 122 *N.J.* 420, 453–54, 585 *A.*2d 864 (1991). Here, as in *Moore*, the concept of mental disease was critical to defendant's case. "Anyone moderately familiar with criminal trials and the public's reaction where juries acquit on murder charges by reason of defendant's insanity knows the strength of these concerns and the vulnerability of the justice

system to extreme erosion of confidence. Sociological studies confirm this." *In re Edward S.*, 118 *N.J.* 118, 139, 570 *A.2d* 917 (1990) (citing Valerie P. Hans, *An Analysis of Public Attitudes Towards the Insanity Defense*, 24 *Crim.* 393, 396, 404 (1986) (89.2% of those polled believed that insanity defense allowed guilty persons to go free)).

■ Whether those figures are accurate is not the issue. Many people have a great deal of difficulty in accepting insanity as a meritorious defense. *See State v. Jasuilewicz*, 205 *N.J.Super.* 558, 567, 501 *A.2d* 583 (App.Div.1985) (requiring, in circumstances of case, "searching" judicial inquiry on juror attitudes toward insanity defense), *certif. denied*, 103 *N.J.* 467, 511 *A.2d* 649 (1986). Through questionnaires, its own questions, and with the assistance of counsel, a court should decide whether a juror can evaluate the testimony of psychiatric witnesses by the same standard that he or she would apply to the testimony of any other witness.

That is the approach that was followed here. The prosecutor explained to Arlene P. that "we want[ ] to put a jury in a position of to be, more or less, a blank slate and then hear all the circumstances and evidence," and that court and counsel were concerned about her willingness to deal with psychiatric testimony. She responded: "I guess I should have answered in a more direct way, which I didn't. *I'm sure I don't have any*—I guess I could, you know, evaluate [a case] with a psychiatric evaluation." (Emphasis added). On balance, the court did not err in assessing her ability to serve. The entire colloquy shows a frank exchange of the juror's views and a willingness to evaluate psychiatric evidence.

The other challenged juror, Laura J., was asked to describe her attitude toward the death penalty, and responded: "[S]ometimes it would be advisable. Rather than have somebody rot in prison if they're never going to make anything of themselves." She explained her answer by saying: "What I meant by that was if there's no hope of rehabilitation or if it's just simply not going to do any good because the crime was too horrible the circumstances

were too horrible, I don't know what they are but I could—I really could go either way."

Defendant argues that she should have been dismissed for cause because the view that execution is preferable to rotting in prison has no place in deciding the fate of an individual who wishes to live rather than die. Defense counsel argues that Laura J.'s position, though it might be altruistic, would substantially impair her application of the death-penalty statute. However, those were isolated exchanges in the complete questioning. Immediately after volunteering her first remarks about a death-sentenced prisoner not having to rot in jail, she explained that she did not feel that in all instances a murderer should receive the death penalty. The trial court's reaction was that "[S]he is very thoughtful. She's trying to consider her answers before she responds." Laura J. agreed that she would weigh the aggravating and mitigating circumstances.

These were close questions. Arlene P.'s views on psychiatric evidence were troublesome, as was Laura J.'s view regarding convicted murderers "rotting" in jail.

Even if the trial court erred in seating those two jurors, we do not find that the loss of two peremptory challenges produced an unfair trial. In *State v. Bey*, 112 *N.J.* 123, 154, 548 *A.*2d 887 (1988), we explained that an improper denial of a for-cause challenge does not always require a new trial. Among the factors to be considered are whether the jurors were eventually removed from the jury, the stage at which they were removed, the effect on counsel's strategy, any apparent unfairness to the defendant, and whether additional peremptory challenges were required. Court and counsel were well aware of those standards. Defendant requested additional challenges. The court granted defendant an additional peremptory challenge to remove one juror as to whom a challenge for cause had been denied. The State exercised about one-half of its allotted peremptory challenges. Defendant had a fair opportunity to select jurors. Both defense counsel and the prosecutor were given great leeway in posing *voir dire* questions

to the jurors. The court was receptive to almost all of counsels' requests in framing questions. The jury was fairly selected.

3. Did the trial court commit *Gerald* error by failing to define the difference between intent-to-kill murder and SBI murder in its jury charge?

The Legislature amended the New Jersey Code of Criminal Justice in 1979, *c.* 178, to include two forms of purposeful or knowing murder. *N.J.S.A.* 2C:11–3a(1) and (2) (criminal homicide constitutes murder when the actor purposely or knowingly causes death or serious bodily injury resulting in death). (Felony murder is a third form of murder. *N.J.S.A.* 2C:11–3a(3).) As we explained in *State v. Gerald, supra,* 113 *N.J.* at 77–78, 549 *A.*2d 792, when the death penalty was superimposed on the Code of Criminal Justice in 1982, no specific reference was made to which form of knowing and purposeful murder under *N.J.S.A.* 2C:11–3 would be death-eligible. However, the legislative history of the act helped us determine that it was only the intentional killing that was to be subject to the death penalty. *Id.* at 89–90, 549 *A.*2d 792.

We thus ruled in *Gerald* that if required by the evidence a jury must consider, in the alternative, whether defendant purposely or knowingly caused death, or purposely or knowingly caused serious bodily injury that resulted in death. Only the former offense renders a defendant death-eligible. *Id.* at 69–70, 549 *A.*2d 792. In *State v. Dixon,* 125 *N.J.* 223, 253, 593 *A.*2d 266 (1991), we said: "Under our system of justice only a jury that knows the difference between the two forms of murder and the question that it must [answer]" may decide who shall be sentenced to death.

 Defendant contends that the jury charge did not meet those standards. The charge joined together the two forms of murder without clearly distinguishing them. For example, in its charge the court said:

Now, a person is guilty of murder if he purposely causes death or serious bodily injury resulting in death or knowingly causes death or serious bodily injury resulting in death. In order for you to find the defendant guilty of murder, the State is required to prove each of the following elements beyond a reasonable doubt, one, that the defendant caused [Ron Ellison's] death or serious bodily injury

resulting in [Ron Ellison's] death and two, that the defendant did so purposely or knowingly.

\* \* \* [A] person who causes another's death does so purposely when it is the person's conscious object to cause death or serious bodily injury resulting in death. A person who causes another's death does so knowingly when the person is aware that it is practically certain that his conduct would cause death or serious bodily injury resulting in death. The nature of the purpose or knowledge with which the defendant acted towards [Ron Ellison] is a question of fact for you the jury to decide.

That charge separates the mental states of knowledge and purpose, not the mental intents to kill or seriously injure. Later, the court charged the jury: "If you determine that the State has proven beyond a reasonable doubt that the defendant purposely or knowingly caused death or serious bodily injury resulting in death you must find the defendant guilty of murder."

Conscious of the *Gerald* issue, the court in reviewing the jury's verdict sheet at the conclusion of the charge, explained that there were two verdicts of murder: "[G]uilty of murder for purposely or knowingly causing death by his own conduct or guilty of murder for purposely or knowingly causing serious bodily injury resulting in death. Check off one of those." However, neither the instructions nor the verdict sheet explained that only the first form of murder was death-eligible.

Defendant contends that this reference to the verdict sheet, unaccompanied by a reinstruction that the jury must so find unanimously and beyond a reasonable doubt, diluted the State's burden of proof. We are satisfied that, taken in its entirety, the court's charge always emphasized the State's burden to prove those elements (that trigger death-eligibility) unanimously and beyond a reasonable doubt. It stated that "the burden of proving the defendant guilty of the offenses charged here beyond a reasonable doubt is always on the State and that burden never shifts." The jury understood its role in choosing the murder verdict. Among the first comments made in general instructions to the jury panels were these:

[U]nder our law, only certain murders are punishable by death. \* \* \* A defendant convicted of murder is subject to the death penalty only if he purposely or

knowingly caused the death of the victim by his own conduct or as an accomplice procured the commission of the offense by paying or promising to pay anything of a pecuniary value.

A defendant who is convicted of knowingly causing serious bodily injury resulting in death is not subject to the death penalty. Stated differently, a defendant who intended to inflict only serious bodily injury and death unintentionally results is guilty of murder, but is not subject to the death penalty, and, similarly, a person convicted of felony murder is not subject to a death penalty.

Every juror was asked if he or she understood the concept of a presumption of innocence and accepted that the State bore the burden of proof on every element of the charge. Defense counsel did ask the trial court to indicate in its instructions that the purposeful or knowing murder verdict was the capital-murder verdict. Counsel could, however, point to no language in *Gerald* that required that instruction. The prosecutor agreed that some reference in the verdict sheet might be warranted. The court seemed hesitant to do so because it might appear to the jury that it was thereby making a decision on the penalty, although it recognized that it could give the jury a cautionary instruction. In the end, the court was satisfied that "we would be able to tell from the verdict that the jury checks off whether it's capital or non-capital." The point could have been more clearly stated in our *Dixon* decision.

In future cases, whether required by constitutional compulsion or not, courts should explain to juries the difference between the forms of murder submitted for their verdict (e.g., where appropriate, murder as principal or accomplice, or as accomplice who has given value to procure the killing), that some are capital and others are not, and that they must agree unanimously and beyond a reasonable doubt on those elements of their verdict that trigger death eligibility. Under the principles of *State v. Mejia*, 141 *N.J.* 475, 662 *A.*2d 308 (1995) (also decided today), and *State v. Brown*, 138 *N.J.* 481, 651 *A.*2d 19 (1994), courts must instruct juries that to convict one of murder that is not death-eligible they need not unanimously agree on the form of murder, provided that they agree unanimously and beyond a reasonable doubt that the defendant is guilty of murder.

But this is not a case of a reviewing court with an uncertainty about the basis for the jury's verdict. Nor is this a case in which the jury convicted defendant of murder without specifying on which of the two distinguishable bases he was convicted. *See State v. Gerald, supra,* 113 *N.J.* at 92, 549 *A.*2d 792. We have a separate, unanimous verdict that the defendant by his own conduct knowingly or purposely caused the death of Ron Ellison.

Even when we could not discern the basis for the jury's murder verdict (intent to kill or SBI), we have not reversed on *Gerald* grounds absent a rational basis for the jury to find an intent merely to cause serious bodily injury. *See State v. Bey,* 129 *N.J.* 557, 581, 610 *A.*2d 814 (1992) (finding failure to give *Gerald* charge harmless, even when aggravated manslaughter had been charged, because "evidence that defendant [who stomped and strangled victim] intended to cause death or knew that death was practically certain to occur [was] so compelling as to exclude the possibility that he possessed a less culpable state of mind"); *State v. Rose,* 120 *N.J.* 61, 63–64, 576 *A.*2d 235 (1990) (holding that one who fired shotgun into police officer's stomach at close range had to be practically certain the shot would cause death); *State v. Hightower,* 120 *N.J.* 378, 413–14, 577 *A.*2d 99 (1990) (holding that shooting victim in chest, neck, and head supports a finding of intent to kill). *Compare State v. Clausell,* 121 *N.J.* 298, 313–16, 580 *A.*2d 221 (1990) (finding evidence that defendant, aiming low, shot victim through door could rationally support finding that defendant intended only serious bodily injury); *State v. Pennington,* 119 *N.J.* 547, 560–65, 575 *A.*2d 816 (1990) (finding evidence that defendant reflexively fired gun when victim threw a glass at him was sufficient to warrant *Gerald* charge).

In this case, the jury returned a separate verdict sheet that found the defendant guilty of knowingly and intentionally causing death, the principal theme of the defense was insanity or diminished capacity, and no rational jury could have found that one who shoots a handcuffed victim in the back of the neck would not have been practically certain that death would result. Therefore, we

find that any failure to describe more fully the difference between intent-to-kill murder and SBI murder was harmless.

The New Jersey Constitution was amended in 1992 to permit capital punishment of a defendant who intended only serious bodily injury resulting in death without offending the prohibition against cruel and unusual punishment contained in the New Jersey Constitution. *N.J. Const.* art. 1, ¶ 12. The Legislature amended the Criminal Code to reflect that change. *N.J.S.A.* 2C:11–3i.

▆▆▆ Because this homicide took place before those constitutional and statutory amendments, the *Gerald* distinction applied to this trial. A capital charge without distinction between the two forms of murder under our statute (intentional or SBI) would not offend the New Jersey Constitution. Courts and counsel formulating charges to juries in future cases, however, should clarify that the mental state required for a capital conviction based on SBI murder should be consonant with the federal constitutional mandate in *Tison v. Arizona,* 481 *U.S.* 137, 107 *S.Ct.* 1676, 95 *L.Ed.*2d 127 (1987), that the actor be recklessly indifferent to whether the result of the conduct would be death. *State v. Gerald, supra,* 113 *N.J.* at 74–75, 549 *A.*2d 792.

4. Should the trial judge have instructed the jury that if it agreed that defendant purposely or knowingly caused death or serious bodily injury resulting in death but was divided on the question of whether the defendant's intention was to kill or injure, it could return a verdict of guilty of non-capital murder on the basis of that non-unanimous finding?

▆▆▆ This point is identical to one raised in *State v. Mejia, supra,* 141 *N.J.* 475, 662 *A.*2d 308, also decided today. In *Mejia,* 141 *N.J.* at 486–87, 662 *A.*2d at 313–14, following the principles set forth in *State v. Brown, supra,* 138 *N.J.* 481, 651 *A.*2d 19, the Court explains that a jury need not be unanimous on the various theories under which guilt for murder may be established. Thus, for example, one may be found guilty of murder even if jurors do not unanimously agree whether the actor's role was that of principal, accomplice, or co-conspirator. *State v. Brown, supra,* 138 *N.J.* at 520–22, 651 *A.*2d 19. So, too, in non-capital murder

cases we have never required that a jury be instructed that it must be unanimous on whether the defendant knowingly or purposely intended to cause death, or knowingly or purposely intended to cause serious bodily injury resulting in death. In *State v. Mejia, supra,* 141 *N.J.* at 486–87, 662 *A.*2d at 313–14, the Court holds that in the circumstances of that case the jury should have been instructed that it could have returned a verdict of guilty of murder although they were not unanimous on the theory of murder, whether intentional or SBI.

If there were any possibility that this jury reached an incorrect verdict because of the omission of a *Brown/Mejia* charge, we would set aside the capital conviction. Given the overwhelming evidence of intent to kill and the absence of any evidence of an intent merely to injure, we are convinced that the omission of such a charge did not prejudice defendant. The inexorable focus of this case was the troubled mental state of defendant. In his opening statement, defense counsel acknowledged where his focus lay, saying "we do not suggest for a moment that you acquit Joseph Harris * * * that's not what we ask." He explained to the jury that an acquittal by reason of insanity would not release defendant to the streets.

> There is a procedure. It is in place. And [the trial judge] will advise you. * * * [W]e do not stand before you and suggest that Joseph Harris did not kill [Ron Ellison]. It is clear from this moment on that Joseph Harris killed [Ron Ellison]. That is not the question. That is not the issue. But the issue is was Joseph Harris insane at the time that this offense was committed. And you will hear testimony from psychiatrists, and you will have to evaluate that testimony. And we ask you to listen to that testimony. And we ask you, as we did during the jury selection process, to fairly and impartially evaluate that and to listen carefully. And if you do that, you will return a verdict that is fair.

For the reasons stated in connection with the *Gerald* charge, we find that the failure to charge on the non-unanimous theories for finding defendant guilty of non-capital murder was harmless because on this record there was no rational basis on which the jury could find an intent merely to cause serious bodily injury. This is not a case in which there was a possible accomplice charge or a possible conspirator charge. *See State v. Brown, supra,* 138 *N.J.*

at 522, 651 A.2d 19 (holding that jury must be permitted to find defendant guilty of murder as *either* principal or accomplice). Defense counsel's closing argument (albeit with one reference to whether one who intended death "would put [only one] bullet in the person's neck") repeated the original theme: "[N]ever lose sight of the issue which is, was Joseph Harris insane at the time he committed this offense." Defense counsel's final words to the jury asked for a "fair and impartial verdict" on whether "Joseph Harris was insane or * * * not insane on the night that this alleged offense occurred."

The issue is whether there was a rational basis on which the jury could have concluded that defendant intended only serious bodily injury when he shot his victim in the neck. The most factually analogous case is *State v. Coyle,* 119 *N.J.* 194, 574 A.2d 951 (1990). In that case, the defendant shot his victim in the back of the head and received a *Gerald* reversal. But we emphasized that there was a sufficient basis on which to find that the defendant had intended to cause serious bodily injury rather than to kill. *Id.* at 209, 574 A.2d 951. The defendant was trying to stop the victim from attacking his girlfriend. At trial the defendant said, "All I wanted to do was to hit him and disable him * * *." *Id.* at 210, 574 A.2d 951.

Ron Ellison was not attacking anyone. The forensic evidence was that Ron Ellison was shot in the back as he lay on the ground. The forensic pathologist determined that there was a "shored exit wound" on the victim's neck. Therefore, he concluded that the victim was lying on the ground when the shot was fired. Of course, that is not the only way in which the wound could have been inflicted. But what purpose did the gunshot have other than to kill? There was no rational basis on which to conclude that defendant's intent was to commit only serious bodily injury or that he was not practically certain that death would result. The facts in this case are strikingly different from *State v. Mejia, supra,* 141 *N.J.* 475, 662 A.2d 308, where the defendant claims that he slipped while chasing the victim and accidentally fired the gun. The

*Brown/Mejia* issue was not raised below. We are satisfied that in the circumstances of this case the claimed error did not have the clear capacity to bring about an unjust result and was harmless beyond a reasonable doubt. *State v. Crisantos (Arriagas),* 102 *N.J.* 265, 273, 508 *A.*2d 167 (1986).

<blockquote>
5. Did the trial court's instruction that the jury not consider the evidence of mental disease or defect until after it had rejected the insanity defense create an unacceptable risk that the jury would not consider whether defendant's mental conditions prevented him from forming the mental state required for conviction of the offenses charged?
</blockquote>

This issue arises, in part, from the tortuous manner in which federal constitutional doctrine treats the effect of mental disease or defect on criminal culpability and the presence of the so-called *mens rea,* or requisite intent to commit the offense. In *State v. Breakiron,* 108 *N.J.* 591, 611, 532 *A.*2d 199 (1987), we ruled that even though the statute then governing the diminished capacity defense imposed the burden of proof on a defendant to establish that defense, the burden imposed required a defendant to show only the existence of a mental disease or defect that is relevant to the mental state of the offense, not that the disease or defect would negate a criminal mental state. The State still had to establish the required *mens rea* for the offense. *Id.* at 613, 532 *A.*2d 199.

That interpretation, we thought, would pass constitutional muster because it imposed no burden on the defendant to disprove an essential element of the crime charged. Subsequently, in *Humanik v. Beyer,* 871 *F.*2d 432, 443, *cert. denied,* 493 *U.S.* 812, 110 *S.Ct.* 57, 107 *L.Ed.*2d 25 (1989), the Third Circuit ruled that imposing any burden of proof on a defendant violated federal due-process requirements by creating a "filter" that impermissibly relieved the State of its obligation to prove beyond a reasonable doubt every element of a crime. The Legislature has since amended *N.J.S.A.* 2C:4–2, the diminished-capacity law. *L.*1990, *c.* 63, § 1. As a result, courts no longer charge that defendants assert a statutory affirmative defense when they present evidence of mental disease or defect relevant to the state of mind that the State must prove.

In contrast, federal constitutional doctrine holds that it is permissible to impose on the defendant the burden of proving an insanity defense that exculpates the defendant. *Leland v. Oregon*, 343 *U.S.* 790, 72 *S.Ct.* 1002, 96 *L.Ed.* 1302 (1952). In 1979, the Legislature essentially reenacted the *M'Naghten* test of criminal insanity, which looks to whether the accused suffers from "such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong." *N.J.S.A.* 2C:4–1. Insanity is an affirmative defense that must be proven by a preponderance of the evidence.

The psychiatric theory that distinguishes insanity from mental disease or defect may be seen in the case of an actor who knows that he is killing his mother but believes that the voice of a god has directed him to do it. Such a person knows that he is killing and intends to kill. In contrast, a person with a diminished capacity of mind who drops a small child to the floor might not know that the action was practically certain to cause death or serious bodily injury resulting in death. Those are difficult distinctions to present to a jury.

In this case, Harris presented the defense of insanity, claiming that he was driven by "his own reality" to commit the criminal act and that he did not know that what he was doing was wrong. He had the burden of proving insanity as an affirmative defense. If established, it would have served to exculpate him entirely from the murder charge. Defendant also presented evidence of mental disease or defect that could have negated the mental state of knowledge or purpose. *See State v. Galloway*, 133 *N.J.* 631, 646, 628 *A.2d* 735 (1993) (stressing permissive definitions for mental disease or defect and difficulty of showing that "an impenetrable line exists between a mental disease affecting cognitive facilities and one affecting impulse control or emotions").

Jurors are frequently told not to consider lesser-included offenses until they first find the defendant not guilty of the greater offense. *State v. Coyle, supra,* 119 *N.J.* at 223, 574 *A.2d* 951; *see*

*People v. Boettcher*, 69 *N.Y.*2d 174, 513 *N.Y.S.*2d 83, 505 *N.E.*2d 594 (1987) (holding that juries should not be permitted to consider a lesser-included offense until after they unanimously find defendant not guilty of the greater offense). The premise is "that it is the duty of the jury not to reach compromise verdicts based on sympathy for the defendant or to appease holdouts, but to render a just verdict by applying the facts it finds to the law it is charged." *Id.* 513 *N.Y.S.*2d at 85–86, 505 *N.E.*2d at 597. The concept of sequential resolution of available verdicts poses problems. We have therefore emphasized that in fashioning sequential charges "care must be taken to avoid the stratification of thought that would deter a jury from returning the proper available verdict." *State v. Zola*, 112 *N.J.* 384, 406, 548 *A.*2d 1022 (1988), *cert. denied*, 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989). Here, the question is whether there was such stratification of the jury's deliberations to deter the jury from returning the proper available verdict. We think not.

The trial court went to great lengths to fashion a fair and correct charge in the face of the difficult task of assuring that the jury not be confused by the constitutionally-driven burden shifting between insanity (the defendant bears the burden) and diminished capacity (the State bears the burden). The court reviewed with counsel a written charge that it submitted to the jury without exception. Defendant now complains of portions of the oral charge.

The trial court prefaced its charge on insanity with the following:

> Now the defendant maintains that he is not guilty of the crimes charged by reason of insanity. If you find that the State has failed to prove beyond a reasonable doubt any essential element of the offense or the defendant's participation in the offense, you must find the defendant not guilty and you need not consider the evidence as to the defendant's insanity. If you find that the State has proved beyond a reasonable doubt each essential element of the offense and the defendant's participation in the offense, you must then consider the evidence as to the defendant's insanity.

Defendant argues that at the same time the court should have instructed the jury to consider evidence of diminished capacity in

determining whether the State had met its burden with respect to the essential elements of the offenses charged.

Next, the trial court instructed the jury on the insanity defense, noting that defendant had the burden to prove insanity by a preponderance of the evidence. It also informed the jury, however, that although defendant bore the burden with respect to the insanity defense, the overall burden of proving the elements of the offense charged remained always with the State.

It then instructed the jury on diminished capacity:

> Now, if you determine that the defense of insanity has not been proven by the defendant, you will consider whether or not the defendant suffers from * * * diminished capacity. There has been evidence produced that defendant suffers from mental disease or defect. You must consider such evidence in determining whether or not the State has proved beyond a reasonable doubt that the defendant acted purposely or knowingly.
>
> * * * * * * * *
>
> * * * If the evidence of mental disease or defect or any other evidence or lack of evidence prevents the State from carrying its burden of proving beyond a reasonable doubt that the defendant acted purposely or knowingly, then you must acquit the defendant of the appropriate offense.
>
> If, however you find that the State has proved beyond a reasonable doubt that the defendant acted purposely or knowingly, together with all the other elements of the offense, then you must convict the defendant of the applicable offense. Again I would reiterate you only consider diminished capacity in the event that you find that the defendant has not carried his burden as to the defense of insanity.

Defendant objected to the last portion of the charge above. He suggested that the charge was internally contradictory and effected a subtle "burden switch." The trial court agreed to reinstruct on diminished capacity without reference to insanity. Defense counsel had no objection to the recharge.

On the second day of deliberations, the jury requested reinstruction on the burglary, robbery, and theft counts. Defense counsel requested that the court also reinstruct regarding diminished capacity. The trial court declined to do so because the jury had not requested reinstruction on diminished capacity. It agreed, however, to remind the jury that it must consider evidence of diminished capacity when determining whether the State had

met its burden of proof on all elements of the charged offenses. At the conclusion of the robbery recharge, the judge included this language:

> This [diminished capacity], however, would also be considered in conjunction with the defendant's defense of insanity. In other words, first you'll consider the defense of insanity. If you find that that's not appropriate, then you will go to the defense of diminished capacity and make a decision as to that.

> * * * * * * * *

> Again, in considering the innocence or guilt of the defendant on this charge as on all of the charges, you have to consider whether or not the defense of insanity or the defense of diminished capacity is applicable. Even if the State has proven each and every element if you find the defense of diminished capacity is applicable here, then the finding would be not guilty.

Although trial counsel did not object, defendant now complains that the trial judge improperly repeated the sequential instruction and referred to diminished capacity as a "defense." Defendant contends that the charge fostered the likelihood that the jury simply did not conscientiously consider whether the evidence of diminished capacity negated the *mens rea* element of purposeful or knowing conduct. Defendant claims that the jury was weary from its prior deliberations in which, without considering the effect of mental disease or defect, it found that the State had proven the elements of the crimes, and then found that defendant had not produced a preponderance of the evidence of insanity.

We disagree. The trial court's reinstruction on diminished capacity made it perfectly clear to the jury that it must consider diminished capacity evidence in relation to the State's burden to prove the essential elements of the crime. The fleeting references to the sequential order of deliberation and the "defense" of diminished capacity, given with respect to the recharge on burglary and robbery, were not likely to have confused the jury. The jury had not requested reinstruction on diminished capacity, and it had the court's correct instruction provided to them in written form. The written instructions given to the jury do not contain the errors defendant claims to be present in the judge's oral instructions.

The sequential instructions do not contain the reversible errors noted in *State v. Erazo*, 126 *N.J.* 112, 594 *A.*2d 232 (1991) and *State v. Coyle, supra*, 119 *N.J.* 194, 574 *A.*2d 951. In *Erazo*, we said:

> [T]he [trial] court erroneously instructed the jury that it could find passion/provocation manslaughter only if it first acquitted defendant of knowing or purposeful murder. This instruction is backwards. Only a homicide that would otherwise be a knowing or purposeful murder may be reduced to manslaughter by the presence of passion/provocation.
>
> [126 *N.J.* at 125–26, 594 *A.*2d 232.]

In this case, we do not have a backward charge. The court did not tell the jury that it could ignore evidence of diminished capacity in convicting defendant of murder. In essence, the jury was told that it could ignore evidence of diminished capacity if it acquitted defendant of murder by reason of insanity. In addition, whatever error or confusion that existed was corrected by the subsequent curative jury instruction. That later instruction "undid much of the damage caused by the earlier charge." *State v. Heslop*, 135 *N.J.* 318, 323, 639 *A.*2d 1100 (1994).

These, then, were not contradictory and inconsistent charges that "create a reasonable likelihood that a juror understood the instructions in an unconstitutional manner." *Francis v. Franklin*, 471 *U.S.* 307, 323 n. 8, 105 *S.Ct.* 1965, 1975 n. 8, 85 *L.Ed.*2d 344, 359 n. 8 (1985), *quoted in State v. Moore, supra*, 122 *N.J.* at 433, 585 *A.*2d 864; *accord State v. Oglesby*, 122 *N.J.* 522, 529–30, 585 *A.*2d 916 (1991) (holding that jury instruction improperly misled jury to believe that defendant had burden of proving his diminished capacity). In both *Moore* and *Oglesby*, there was no way to determine whether the jury had followed the incorrect instruction that the defendant prove mental disease or defect by a preponderance of the evidence.

This jury was given the correct instructions. At worst, they were not easy to follow. Defendant thus asserts that the instruction falls short of the standard that the court give a "plain and clear exposition of the issues" that explains to the jury "in an understandable fashion its function in relation to the legal issues

involved." *State v. Green,* 86 *N.J.* 281, 287–88, 430 *A.*2d 914 (1981). It is no easy task to simplify the burden shifting that federal doctrine requires. In this case, the court clarified its charge when requested. In addition, it did what few courts do: It gave the jury correct written instructions. The court explained:

> I have the greatest faith in the intelligence of this jury. I think they're an extremely competent jury, they have been paying close attention throughout the trial.
>
> My only concern is with the jury being able to recall the complexities of the charge dealing with insanity and/or diminished capacity. Quite frankly, I dare say that we could assemble a courtroom full of the finest legal minds, but those that have had absolutely no contact with and no knowledge of the diminished capacity defense or insanity defense and I can read them that charge and send them out and have them squabbling over what I said and what I meant for days or weeks on end. I think it has nothing to do with the intelligence of the jury. I'm inclined to allow them to have a copy of the charge as it relates to insanity and diminished capacity. I see nothing that would preclude it quite frankly.

When considered as a whole, especially in light of subsequent instructions and the correct written instructions, the charge correctly stated the law.

> 6. Should the court have charged the jury that defendant's claim of right to recover his invested funds was a defense to the robbery charges?

*N.J.S.A.* 2C:20–2c(2) establishes "claim of right" as an affirmative defense to theft. The statute provides:

> c. Claim of right. It is an affirmative defense to prosecution for theft that the actor:
>
> \* \* \* \* \* \* \* \*
>
> (2) Acted under an honest claim of right to the property or service involved or that he had a right to acquire or dispose of it as he did; \* \* \*.

Theft is an essential element of robbery. Defendant, therefore, contends that the court should have charged the jury that if it found that he had an honest claim of right to recover his money from Ellison, such a claim would provide a defense to robbery. The absence of such an instruction, he contends, undermines the reliability of the verdicts concerning robbery and felony murder.

He claims that this problem also infected the penalty phase of the proceedings because the charge failed to instruct the jury

properly on a defense to the crime of robbery, a predicate felony for both aggravating factors proffered by the State. Those factors included killing to avoid detection for the commission of an offense, and killing in the course of committing another felony. *N.J.S.A.* 2C:11–3c(4)(f) and (g). Had the jury accepted the defense of claim of right, it would have entered the penalty phase with one fewer offense underlying each of those aggravating factors. (Of course, defendant had no claim of right to the $700 he took from Ilene Ellison.) In addition, defendant contends that, at a minimum, the court should have instructed the jury that the evidence pertaining to the claim of right could affect the weight of both aggravating factors by differentiating this robbery from other robberies in which a claim of right was completely absent.

The point arises as a matter of plain error and we must determine whether the failure to charge had the clear capacity to bring about an unjust result. There are really two aspects to this issue: (1) the extension of the claim-of-right defense to recovery of property through the use of force; and (2) the meaning of the word "property." Is "property" limited to specific items of tangible property or does it include unliquidated claims of right or debt?

In *State v. Mejia, supra,* 141 *N.J.* at 490–91, 662 *A.*2d at 315–16, the Court holds that the statutory defense of claim of right is not a defense to robbery. The defense is limited, and does not apply to the taking of money or valuables in liquidation of an uncertain obligation or a debt. That is consistent with the historical development of the concept at common law and the way in which we believe that our Legislature intended it to be applied.
There are strong public policy reasons why self-help, involving the use of force against a person, should not be condoned. For that reason most courts have tended to apply claim of right strictly under those circumstances. Courts have held that the defense does not apply unless the defendant was attempting to retrieve a specific chattel that was the subject of a prior claim of right; the defendant may not attempt to take money or property of equivalent value. [*Jupiter v. State,* 328 *Md* 635, 616 *A.*2d 412, 417 (1992) (citing *Thomas v. State,* 584 *So.*2d 1022, 1025 (Fla.Dist.Ct.App.), *cause dismissed,* 587 *So.*2d 1331 (Fla. 1991); *State v. Brighter,* 62 *Haw.* 25, 608 *P.*2d 855, 859 (1980); *People v. Reid,* 69

N.Y.2d 469, 515 N.Y.S.2d 750, 752–53, 508 N.E.2d 661, 664 (1987); *State v. Winston*, 170 W.Va. 555, 295 S.E.2d 46, 51 (1982); *Edwards v. State*, 49 Wis.2d 105, 181 N.W.2d 383, 387–88 (1970).]

Accordingly, in the circumstances of this case, the court below did not err in failing to instruct the jury that there was a defense of claim of right to the property. Because we do not believe defendant was entitled to any statutory defense of claim of right to the property, we do not believe the penalty-phase proceedings were tainted. The jury was aware that defendant had been defrauded by the victim and that defendant claimed the right to recover funds from the victim. In fact, the jury specifically and unanimously found the following mitigating factors:

The defendant lost a large sum of money to the victim which caused mental and/or emotional distress, and caused dispare [sic] by the apparent loss of his aspirations of home ownership. * * *

The defendant was further frustrated by the victim's evasive, uncivil, and unethical behavior in their business relationship.

Hence, we see no prejudice to defendant in connection with the claim of right issue.

7. Did the prosecuting attorney unfairly state in the guilt and penalty phases of the trial that it was a fact that defendant had removed his hood and the blindfold from the victim before the killing?

The determination of whether prosecutorial misconduct exists must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties. A prosecutor in a criminal case is expected to make a vigorous and forceful closing argument to the jury. As Justice Clifford observed in his dissent in *State v. DiPaglia*, 64 N.J. 288, 305, 315 A.2d 385 (1974):

Criminal trials are emotionally charged proceedings. A prosecutor is not expected to conduct himself in a manner appropriate to a lecture hall. He is entitled to be forceful and graphic in his summation to the jury, so long as he confines himself to fair comments on the evidence presented.

[Citations omitted.]

Prosecuting attorneys are afforded considerable leeway if their comments are reasonably related to the scope of the evidence before the jury.

This was the evidence: At the Ellisons' house, defendant wore a black hood that covered his face with an opening at the eyes. The police found the hood in the Ellisons' ground-floor den. . No testimony disclosed when the hood had been removed. Harris blindfolded and handcuffed each member of the family. The State's witnesses testified that Ellison's body was found in the backyard, his hands still secured behind him. No testimony suggested that Ellison was blindfolded when found or that his blindfold was lying in the house or backyard. In the guilt phase, the prosecutor argued:

> And given the fact that Joseph Harris had just spent all that time in the house with the victim and given the fact that now he is unmasked, that was a purposeful shot and just in the same line of thinking that he's telling the other people, don't tell anybody about this, he's concerned about that issue, that's why [Ron Ellison] is dead * * *.

In the penalty phase, the prosecutor argued:

> He was shot running away from the house and running away from the defendant. And what we know clearly from the facts are that the hood was off, that the blindfold was off and that [Ron Ellison] was shot in the head by the defendant in the backyard at the last moment before he fled from the scene of the crime.

There was ample testimony, however, that the blindfolding was done haphazardly, and that at least Mrs. Ellison was able to see defendant who was wearing his "Ninja" hood. The victim's body was found without a blindfold. The defense theory would have defendant kill the victim outside, then return to the living room to deposit his hood before beginning his escape. No one knows for certain when or how defendant's hood was removed. It is at least a permissible inference (though not the only one) that defendant's hood was taken off or fell off prior to the killing.

In his guilt-phase summation, the prosecutor prefaced his comments in this manner:

> And we'll never know exactly the next sequence of events, but what I suggest to you happened is the hood came off, perhaps because Joseph Harris took it off and revealed himself to the victim and the victim understood clearly then he was never going to leave the scene alive and he tried desperately to get out of the house.

\*　\*　\*　\*　\*　\*　\*　\*

And given the fact that Joseph Harris had just spent all that time in the house with the victim and given the fact that *now he is unmasked,* that was a purposeful shot \* \* \*.

[Emphasis added.]

In the first part of that argument, the prosecutor clearly tells the jury that this is his theory regarding what happened. The prosecutor was commenting on a possible reading of the facts, and he made that contingency reasonably clear to the jury.

At the penalty phase, the prosecutor did make a bolder and more troubling statement. "[W]e know clearly from the facts \* \* \* that the hood was off \* \* \*." It is simply not clear from the facts that the hood was off. Nevertheless, the jury had been thoroughly instructed that the summations of counsel were not evidence. In all probability, the jury knew that both sides were offering their interpretation of what the evidence was and what it meant. Finally, the fact that defense counsel did not specifically object to those prosecutorial mischaracterizations (although he did to others) contributes to the sense that they were understood in the context of an adversarial summation.

8. Did the jury instructions allow for a non-unanimous, patchwork verdict on the underlying felony that sustained the verdict of felony murder and the finding of aggravating factor c(4)(g), the felony factor in the capital sentence?

Defendant was convicted of burglary, robbery, kidnapping, and sexual assaults. All of those are predicate offenses for felony murder. *N.J.S.A.* 2C:11–3a(3). The jury also convicted defendant of purposeful or knowing murder. However, defendant argues that the mere conviction of the predicate offenses did not mandate defendant's conviction of felony murder. The jury had to decide if Ellison's death was caused during defendant's commission of burglary, robbery, kidnapping, or sexual assault, or during the commission of more than one of them. Defendant contends that the jury should have been charged that it had to agree "unanimously on the predicate offenses which resulted in the victim's death."

All verdicts in criminal cases must be unanimous. The court charged that the State must prove only "that the victim's

death was caused by the defendant and it was caused during the commission or flight after committing one of these enumerated crimes." Under the court's charge defendant could have been convicted of felony murder if, for example, eight jurors found that the murder occurred as a result of kidnapping, two found the murder would not have occurred but for the sexual assault, and two decided Ellison's death was a direct result of the robbery.

 "It is assumed that a general instruction on the require-ment of unanimity suffices to instruct the jury that they must be unanimous on whatever specifications they find to be the predicate of the guilty verdict." *United States v. Natelli*, 527 *F*.2d 311, 325 (2d Cir.1975), *cert. denied*, 425 *U.S.* 934, 96 *S.Ct.* 1663, 48 *L.Ed.*2d 175 (1976). Thus, when there is sufficient evidence to support two or more alternative felony theories, a jury need not designate which felony theory it relies on to convict one of felony murder so long as there is sufficient evidence to sustain each felony. *State v. Garcia*, 243 *Kan.* 662, 763 *P*.2d 585, 591 (1988) (citing *State v. Guffie*, 749 *P*.2d 976 (Colo.Ct.App.1987) (holding that jury need not specify which of two victims was robbed)). "The rule stated in *Guffie* has no application where one of the alternative felony theories is invalid, either on constitutional grounds or for a lack of sufficient evidence to support an independent conviction of the defendant on one of the felony theories." *Id.* 763 *P*.2d at 591–92; *see Stromberg v. California*, 283 *U.S.* 359, 51 *S.Ct.* 532, 75 *L.Ed.* 1117 (1931) (recognizing that a general verdict of guilty could not stand if jury relied on two or more independent grounds, one of which was insufficient).

We recently considered the issue of "patchwork verdicts" in *State v. Parker*, 124 *N.J.* 628, 592 *A.*2d 228 (1991), *cert. denied*, 503 *U.S.* 939, 112 *S.Ct.* 1483, 117 *L.Ed.*2d 625 (1992). We held that jurors need not always be unanimous on the theory of guilt, provided they are unanimous in the finding of guilt of the offense charged. *Id.* at 633–37, 592 *A.*2d 228. We reviewed the circum-stances in which a jury can return a unanimous verdict without

unanimously agreeing about some preliminary factual issues. *Ibid.* We stated that in

> some circumstances, however, a general charge on jury unanimity will not suffice. That is so when, for example, "a single crime can be proven by different theories based on different acts and at least two of these theories rely on different evidence, and [when] the circumstances demonstrate a reasonable possibility that a juror will find one theory proven and the other not proven but that all of the jurors will not agree on the same theory."
>
> [*Id.* at 635, 592 *A.*2d 228 (quoting *People v. Melendez,* 224 *Cal.App.*3d 1420, 274 *Cal.Rptr.* 599, 608 (1990)).]

A specific unanimity instruction is required when "it appears that a genuine possibility of jury confusion exists or that a conviction may occur as a result of different jurors concluding that a defendant committed conceptually distinct acts." *Id.* at 641, 592 *A.*2d 228. Theoretically, that possibility existed in this case because each of the felonies alleged as predicates for the aggravating factor or to felony murder involved distinct acts. If, as in a case such as *State v. Dixon, supra,* 125 *N.J.* 223, 593 *A.*2d 266, the jury had acquitted the defendant of one of the predicate felonies, there could be concern about the lack of a specific unanimity instruction. Whatever concerns we might have about the possibility of a patchwork verdict in this case vanish in light of the jury's unanimous findings of guilt of each of the predicate felonies and in light of the absence of a request for a specific unanimity charge. In fact, defendant stipulated to facts that could have established his guilt of two felonies. We agree with our dissenting member that our cases have "recognize[d] the moral dimension of jury verdicts." *Post* at 578, 662 *A.*2d at 360. We have no doubt, however, that the jury conscientiously reevaluated the predicate felonies in the sentencing phase.

▮ To avoid "double counting" or "multiple counting" of the c(4)(g) aggravating factor (killing in the course of a felony), we have not allowed juries to find multiple aggravating factors, even though there might be multiple evidentiary bases for the finding of that aggravating factor. *State v. Bey, supra,* 112 *N.J.* at 176, 548 *A.*2d 887. "Capital sentencing is not a numbers game." *State v. Moore, supra,* 122 *N.J.* at 473, 585 *A.*2d 864. "[W]e do not

allow aggravating factors to be totalled up as bean-counters would do, causing numbers to tip the scale." *Ibid.* Therefore, even when there are multiple underlying felonies, there would be only a single c(4)(g) aggravating factor. *Ibid.*

We are certain that an unintended byproduct of this effort to avoid "double counting" is that a defendant may not wish to have juries total up the multiple underlying felonies that might sustain the single felony-murder factor. In future cases it will suffice if courts charge the jury that to find the existence of the aggravating factor found in c(4)(g), the felony-murder factor in capital-death sentencing, the jury must be unanimous as to the underlying felony that it finds in support of the aggravating factor. For example a court might charge: "If you were to find the c(4)(g) aggravating factor predicated upon the commission of an underlying sexual assault, then you must unanimously agree that the sexual assault was one of the evidentiary bases that you found for the existence of the aggravating factor."

Sometimes, as in *State v. Dixon, supra,* 125 *N.J.* 223, 593 *A.*2d 266, when there are potentially two aggravating factors—sexual assault and robbery—the possibility of a patchwork verdict might genuinely exist. (In *Dixon,* the jury found defendant not guilty of robbery, and the court did not submit the aggravated sexual assault as an underlying factor.) In such a case, counsel may wish to require separate verdicts on the existence of the underlying felony. Here, the jury unanimously found the existence of every felony underlying the felony-murder factor.

9. Should the court have charged the jury that it could not disregard a statutory mitigating factor for which there was reliable evidence either as a statutory factor or as a catch-all factor, and did the jury's rejection of such evidence violate defendant's right to a fair trial?

Among the statutory mitigating factors under *N.J.S.A.* 2C:11–3c(5) are these:

(a) The defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution;

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

(d) The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as the result of mental disease or defect or intoxication, but not to a degree sufficient to constitute a defense to prosecution; * * *.

█ Defendant emphasizes that he offered extensive evidence of mental impairment. A defendant has a minimal burden in establishing the existence of a mitigating factor. "The defendant shall have the burden of producing evidence of the existence of any mitigating factors * * * but shall not have a burden with regard to the establishment of a mitigating factor." 2C:11-3c(2)(a).

█ Defendant relies on *Magwood v. Smith*, 608 *F.Supp.* 218, 228 (M.D.Ala.1985), *aff'd*, 791 *F.*2d 1438 (11th Cir.1986), *cert. denied*, 493 *U.S.* 923, 110 *S.Ct.* 291, 107 *L.Ed.*2d 271 (1989), which stated that "[t]o find that mitigating factors do not exist where such mitigating circumstances clearly exist returns us to the state of affairs which were found by the Supreme Court in *Furman v. Georgia* to be prohibited by the Constitution."

Defendant's psychiatric witness provided evidence that defendant had auditory hallucinations (he heard voices); that he was delusional; that he believed in his own vision and reality; and that he was a chronic paranoid schizophrenic. The witness believed that defendant suffered from a mental disease; was legally insane at the time of the offense; and was not criminally responsible for the conduct because he did not know that what he was doing was wrong but believed that what he was doing was right.

The State's psychiatrist also found that defendant experienced auditory delusions. He believed defendant was not legally insane but instead suffered from a schizoid personality disorder. He acknowledged that if a schizoid personality disorder is severe, one "will not be able to function, will not go to work." He also agreed, in response to defense counsel's questioning, that someone who is not able to function at work might be described in the manner in which defendant's fellow employees described him. Those workers described defendant as erratic, irrational, argumentative, odd,

weird, strange, "wacko," and excessively afraid of germs. They also said that he performed martial arts dances, emitted a death chant, and displayed "outer-space" behavior. Even the prosecutor acknowledged that defendant's state of mind at the time of this incident or at any other time was not normal. But "not normal" may not meet the statute's definition of qualifying mental mitigation.

The difference between this case and *Magwood, supra,* is in the evidence. In that case, there was uncontested evidence of the defendant's mental illness at the time of occurrence. *Magwood, supra,* 791 *F.*2d at 1450 ("[F]our experts ascertained that Magwood suffered from some form of *serious* mental disorder on the date of [the] murder and none testified that [he] was free from mental illness on that date.") (Emphasis added). The c(5)(a) and c(5)(d) mitigating factors require a jury to evaluate whether the emotional disturbance was "extreme" or whether the defendant's faculties were "significantly impaired." *State v. Martini,* 131 *N.J.* 176, 303, 619 *A.*2d 1208 (1993). There was ample conflict between the experts regarding the degree of severity of defendant's mental illness.

The psychiatrist's theories of defendant's motivation included: his desire to "take a stand" for his dignity against encircling discrimination, which had to be measured against his goal in going to the victim's home to get his money back; his war with society for its racist treatment of him, which had to be reconciled with the fact that his victims were black; and his inability to know that what he was doing was wrong, which had to be measured against his description of his action as "a wrong for a wrong." Those inconsistencies might have counterbalanced the weight that jurors might otherwise have given the psychiatrist's theories.

Except for factors such as "no prior record," we have consistently held that "[t]he jury's determination of whether matters in evidence constitute mitigating factors is the result of a qualitative judgment." *State v. Zola, supra,* 112 *N.J.* at 438, 548 *A.*2d 1022. The concepts of one's "extreme mental or emotional

disturbance" or whether one's capacity to appreciate the wrongful-
ness of the conduct were "significantly impaired as the result of
mental disease or defect" inescapably involve a qualitative judg-
ment. *State v. Martini, supra*, 131 *N.J.* at 287, 619 *A.*2d 1208.

We therefore do not believe a jury should be instructed that it
*must* find a statutory mitigating factor for which there is reliable
evidence. A jury certainly should consider all reliable evidence in
assessing whether a factor is present and determine the weight to
which the factor is entitled. But whether the evidence meets the
statutory definition of this mitigating factor requires a qualitative
judgment.

 Finally, defendant argues that his trial counsel should
have asked the court to instruct the jury that it could find mental
impairments under *N.J.S.A.* 2C:11–3c(5)(h), the catch-all factor.
In *State v. Martini, supra*, 131 *N.J.* at 205–07, 619 *A.*2d 1208,
decided on February 9, 1993—before this trial commenced—we
held that instructions on the c(5)(h) factor should be broad enough
to allow the jury to consider mental-health mitigation under less
stringent standards than that prescribed in c(5)(a) and c(5)(d).
Defendant argues that because of ineffective assistance of counsel
he was deprived of a charge in accordance with *Martini*.

We disagree. The trial court fully instructed the jury on the
c(5)(h) factor. It told the jurors that it was not a single factor, but
rather one that required them to consider all the evidence pre-
sented. That included evidence concerning defendant's life, char-
acter, record, and potential for rehabilitation. The trial court
instructed the jurors that the catch-all factor was "an invitation by
the legislature" to use their judgment and compassion to fashion
mitigating factors. Also, the jury verdict reflects a very careful
and searching analysis of the evidence and credit for the deficient
character traits of the defendant.

However, we are satisfied that under the *Strickland/Fritz* test,
a test for evaluating claims of ineffective assistance of counsel,
trial counsel's omission did not have a clear capacity to affect the

result in this case. *State v. Fritz*, 105 *N.J.* 42, 519 *A.*2d 336 (1987). Although the jury did not find the existence of specific mitigating factors, it found the following catch-all mitigating factors:

> The defendant lost a large sum of money to the victim which caused mental and/or emotional distress, and caused dispare [sic] by the apparent loss of his aspirations of home ownership. * * *
>
> The defendant was further frustrated by the victim's evasive, uncivil, and unethical behavior in their business relationship.
>
> \*　　\*　　\*　　\*　　\*　　\*　　\*　　\*
>
> The defendant's life was negatively affected by the knowledge of the circumstances regarding his birth and his mother's relationships.

To have found "emotional distress," "despair," "frustrat[ion]," and "negative" effects on life among the mitigating factors, the jury must have considered all the evidence of mental disease or defect.

> 10. Did the court's instruction that defendant's extreme emotional disturbance must have influenced him to commit the murder add a condition not required by the statute?

■ ‚Recall that the statute provides for mitigation if the defendant was suffering from "extreme mental or emotional disturbance" at the time of the homicide. *N.J.S.A.* 2C:11–3c(5)(a). Defendant argues that, in effect, the court's instruction to the jury was that to find the c(5)(a) factor it must find that the homicide was the *product* of the mental disturbance. The court charged the jury that

> [t]his [factor] is established by evidence showing that the defendant was suffering from an extreme mental or emotional disturbance and that such disturbance influenced him to commit the murder.
>
> \*　　\*　　\*　　\*　　\*　　\*　　\*　　\*
>
> * * * In short, to find the presence of this mitigating factor you must determine that the defendant was suffering from an extreme mental or emotional disturbance and that such disturbance influenced him to commit murder.

The charge seems to require a causal connection between the mental disturbance and the homicide. That requirement, defendant contends, is not in the statute and significantly amends the statute.

The charge did not unfairly deprive defendant of the benefit of the statutory mitigating factor. The c(5)(a) factor refers to a defendant being "under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution." The word "influence" is usually related to the production of an effect. · Webster's Third New International Dictionary 1160 (1971). For example, if an actor were extremely upset because he was recently jilted by a lover, we doubt that that would be a c(5)(a) mitigating factor if he were the hired gun in a mob killing. There is just no connection. On the other hand, if he were to have killed his lover in a jealous rage, the factor might be considered. In State v. Martini, supra, 131 N.J. at 302, 619 A.2d 1208, we tacitly approved an instruction that required the extreme emotional disturbance to have "influenced [the defendant] to commit the murder." In this case there was no objection to the charge. The charge did not incorrectly state the law and did not have the capacity to bring about an unjust result.

11. Did the trial court incorrectly permit the jury to consider the felony offenses against the female members of the Ellison family in aggravation of the homicide?

 Defendant, in a pretrial motion, asked the court to limit the c(4)(g) factor to the offenses committed against the murder victim. Those included robbery, kidnapping, and burglary. Alternatively, defendant asked the court to empanel a separate sentencing jury. The essential question is whether the killing of Ellison was worse because it occurred in the course of the rape of his three other family members and the robbery of one of them.

The c(4)(g) factor is obviously not limited to the commission of a felony against the victim. (For convenience, we use the familiar word "felony," although our Code refers instead to certain offenses.) For example, in State v. Moore, supra, 122 N.J. at 471, 585 A.2d 864, we allowed the c(4)(g) felony factor to be applied to the killings of both mother and child. In other words, the killing of the mother in the course of the killing of the child was an aggravating factor in the killing of the mother. We explained:

[T]he statute does not rely on the temporal sequence of the murders to determine application of that aggravating factor. The factor applies to murders committed

*before, during,* or *after* the commission of a felony, so that the time sequence of the murders is not dispositive of this factor's [c(4)(g)] application.

Thus, the robbery or rape of the first of two murder victims would be admissible in determining death eligibility for the murder of the second victim. Would it not be illogical to allow the jury to consider the robbery or rape of the first victim but not allow it to consider the murder of the first victim in determining death eligibility for the murder of the second?

[*Ibid.*]

 That reasoning applies here as well. Killing a father in the course of raping his child could be an aggravating factor in the case of the father's killing. Defendant relies on *State v. McDougald,* 120 *N.J.* 523, 569–70, 577 *A.*2d 419 (1990), in which the Court cautioned the trial court "carefully to instruct the jury on the necessary relationship that must exist pursuant to c(4)(g) between the felony and the murder," suggesting that if the defendant had intended to commit three murders in the very beginning, then the two consummated murders would not have been committed "in the course of" an attempted murder and would not qualify as an aggravation under c(4)(g). The State suggests that the real issue in *McDougald* was whether a burglary (unlawful entry with intent to commit a crime) should be the predicate felony when the actor always intended to kill the two murder victims. We agree that c(4)(g) requires more than a showing of committing another crime at roughly the same time and place as the murder. However, the statute is very broad. In *McDougald,* we agreed that a jury would decide at the retrial whether the defendant had committed the murder while engaged in committing the other felony. *Id.* at 570, 577 *A.*2d 419.

12. Did other errors taint the trial?

 Trial counsel failed to request the court to instruct the jury specifically that defendant's military service could be found as a mitigating factor. The court did agree that it should give that instruction but simply failed to do so. We do not believe that this had the clear capacity to bring about an unjust result.

 Nor do we agree with defendant that his cooperation with the State, by agreeing to a stipulation that made it unnecessary

for Mr. Ellison's daughters to testify, required that the jury be charged that the stipulation be considered as relevant mitigation under c(5)(h), the catch-all factor. The court properly read the statutory language of c(5)(h) (any other factor relevant to the character of the defendant), adding that the jury should consider all the evidence and evaluate defendant's potential for rehabilitation. The court also characterized the stipulation as an agreement between counsel and the court. Defendant argues that the jury should have been instructed that it was *defendant's* decision to stipulate to the daughters' testimony, not counsels' decision. The defense contends that the mischaracterization of the stipulation rendered the jury unable to ascribe mitigating significance to the stipulation.

The court's instruction to the jury that it could consider all the evidence presented undermines the defendant's position that the jury was unable to ascribe any significance to the stipulation. Additionally, because there is little evidence that defendant's agreement to the stipulation reflected a positive character trait, the stipulation was potentially irrelevant and excludable. The fact that defendant entered into a stipulation is not, in itself, "relevant to his character" such that it was error by the trial court not to have instructed the jury that such an action was potentially mitigating evidence. *See Lockett v. Ohio,* 438 *U.S.* 586, 98 *S.Ct.* 2954, 57 *L.Ed.*2d 973 (1978) (holding that courts may not exclude mitigating evidence relevant to defendant's character, record, or circumstances of offense). It is simply not clear what, if any, mitigating effect the stipulation could have had on the jury. Thus, the trial court's failure to instruct specifically the jury that it could find that the stipulation had a mitigating effect was not improper.

Another issue is whether there was a "rational basis" for a passion/provocation manslaughter charge. *State v. Crisantos (Arriagas), supra,* 102 *N.J.* at 276, 508 *A.*2d 167. The trial court refused to give such a charge. Passion/provocation should be charged when there is a rational basis in the evidence to conclude that: (1) there was adequate provocation for a reasonable person;

(2) the reasonable defendant would not have had an opportunity to "cool off" between the provocation and the slaying; (3) the provocation actually impassioned the defendant; and (4) the defendant had not actually cooled off. *State v. Mauricio,* 117 *N.J.* 402, 411, 568 *A.*2d 879 (1990). Defendant relies on a "course of ill treatment" theory. In *State v. Guido,* 40 *N.J.* 191, 211, 191 *A.*2d 45 (1963), we "acknowledge[d] the undoubted capacity of events to accumulate a detonating force * * *."

Defendant argues that the long-standing course of his ill treatment—the loss of the money, the victim's refusal to discuss it with defendant, and his frustration in not receiving all of the money after holding the family captive—set the stage for defendant's final act of rage. In defendant's view, those facts establish a sufficient rational basis to have warranted a passion/provocation instruction.

Although we acknowledge and embrace the "trend away from 'the usual practice of placing the various types of provocatory conduct into pigeon-holes,'" *State v. Mauricio, supra,* 117 *N.J.* at 414, 568 *A.*2d 879 (quoting 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 7.10, at 256 (1986)), we nonetheless fail to see any basis in the record that would indicate that a reasonable person could have been provoked to murder under these circumstances, or that the person would not have had time to "cool off."

Moreover, the typical "course of ill treatment" involves physical abuse. In *State v. Guido, supra,* 40 *N.J.* at 211, 191 *A.*2d 45, it was the prolonged physical abuse of the defendant by her husband that required the issue of manslaughter to be sent to the jury. In *State v. Mauricio, supra,* 117 *N.J.* at 414–17, 568 *A.*2d 879, when a bouncer and the defendant engaged in two physical confrontations within approximately twenty minutes, the subsequent shooting of the bouncer roughly a half hour later entitled the defendant to an instruction on passion/provocation manslaughter.

Defendant is not entitled to a passion/provocation charge for anything that occurred as a result of his attempts to hold the

victim and his family captive and recover money from them. He created the circumstance of his own passion or provocation and should not benefit from it. The trial court did not err in refusing to charge the jury on the lesser-included offense of passion/provocation manslaughter.

[41] Another issue is whether the State failed to prove beyond a reasonable doubt aggravating factor c(4)(f), that is, whether defendant killed to escape detection for another offense. Recall the evidence. Defendant wore a hood that concealed his face and head. Ellison had not seen defendant for more than three years. Defendant blindfolded Ellison and left the hood behind when he departed. Defendant had spoken truthfully, the State's psychiatrist said, when he stated that he thought Ellison had not recognized him. We do not believe that the evidence clearly established that defendant thought a warning to the victims not to report the incident was sufficient to ensure against detection. The test, which views the evidence in the light most favorable to the prosecution, is whether any rational trier of fact could have found the essential elements of the defendant's guilt beyond a reasonable doubt. *State v. Reyes,* 50 *N.J.* 454, 459, 236 *A.*2d 385 (1967). We are satisfied there was sufficient proof for the jury to have found the factor set forth in c(4)(f).

Finally, at oral argument defendant raised the issue of whether trial counsel was ineffective in not disclosing (at least in the penalty phase) that defendant had been accused of four other murders in Bergen County that had led police to his apartment. Presumably this would strengthen the mental-disease defenses. We decline to consider that issue in this appeal. We would not expect, however, that any post-conviction relief proceeding would find such a decision by trial counsel to have been a poor strategic choice.

III

The cumulative effect of any claimed errors in this case did not deny the defendant a fair trial. For completeness of the record,

we note and reserve defendant's challenge to the proportionality of his death sentence and his claims of excessive sentences violative of the principles of *State v. Yarbough,* 100 *N.J.* 627, 498 *A.*2d 1239 (1985), *cert. denied,* 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986). Following proportionality review, we shall resolve those questions. With respect to defendant's claim that certain non-capital sentences were not to run consecutively, it is clear from the record that the court intended those sentences to be consecutive. It referred to *State v. Yarbough, supra,* 100 *N.J.* 627, 498 *A.*2d 1239, and explained that a deviation was required. With respect to defendant's challenge to the constitutionality of the death-penalty statute, we adhere to our decision in *State v. Ramseur, supra,* 106 *N.J.* at 190, 524 *A.*2d 188, rejecting arguments that the death-penalty statute violated the Eighth Amendment of the United States Constitution or Article 1, paragraph 12 of the New Jersey Constitution.

We affirm defendant's convictions. We also affirm his sentence of death.

HANDLER, J., dissenting in part and concurring in part.

This is a direct appeal from a conviction for capital murder and a sentence of death. Defendant, Joseph Harris, was convicted by a Morris County jury for the knowing and purposeful murder of Ron Ellison. Harris did not deny that he committed the killings; rather, he relied on two psychiatric defenses: insanity and diminished capacity.

The Court affirms defendant's murder conviction and death sentence. I believe defendant did not have the benefit of a correct charge to the jury on the existence of the c(4)(g) aggravating factor. Further, the jury was not properly instructed on, and so incorrectly understood, the mitigating significance of defendant's severe mental and emotional problems. For those reasons I conclude that defendant was improperly sentenced to death. I, therefore, dissent from the Court's affirmance of defendant's death sentence.

I

Defendant observes that at the penalty trial, the jury was instructed that it could find the c(4)(g) aggravating factor if it determined that the murder was committed during the course of a robbery, burglary, kidnapping or sexual assault. That instruction, defendant argues, would allow a thoroughly fragmented jury nevertheless to find the felony murder aggravating factor so long as every juror found that one of the predicate felonies warranted a finding of the aggravating factor. Thus, a jury with three people convinced that the murder occurred during a sexual assault, three during a robbery, three during a kidnapping, and three during a burglary, could find the aggravating factor under the instructions given by the court. That result, defendant contends, is unconstitutional.

Such a fragmented determination can be averted by the use of a specific unanimity charge, a charge that instructs the jury that it can find the aggravating factor only if there is a unanimous finding on the specific offense that constitutes the felony underlying the c(4)(g) aggravating factor. The Court concludes that no such specific unanimity instruction is required, or if one is required, that defendant waived the instruction by failing to request it. Finally, the Court holds any error harmless, finding that because the jurors convicted defendant of all of the charged underlying felonies, they must have agreed unanimously in the penalty phase on the existence of each one. *Ante* at 562–67, 662 *A*.2d at 352–54. I conclude that the absence of a specific unanimity instruction in the penalty phase with respect to the felony that is a predicate to the c(4)(g) aggravating factor is unconstitutional. I would, therefore, reverse the death sentence.

It cannot be overemphasized that in a penalty trial at which the State seeks to prove the c(4)(g) aggravating factor or another aggravating factor, such as c(4)(f), which is based on a predicate offense, and where there is more than one possible predicate offense, jurors, in determining the appropriate sentence, may weigh different predicate felonies differently. For example, the

c(4)(g) aggravating factor may weigh more strongly for death when the underlying felony is sexual assault than when it is burglary. And because jurors must find aggravating factors unanimously, it is essential that they agree unanimously about the underlying felony that supports the c(4)(g) factor. The absence of a specific unanimity instruction means that the jury could have failed to agree unanimously on the existence of a particular predicate felony, but nevertheless have found the c(4)(g) aggravating factor. It should not, in that event, be possible for the jury to determine that the factor has been established.

The trial court here failed to advise the jury that it must agree unanimously on the existence of an underlying felony in order to find the c(4)(g) factor. The court stated:

> Now as far as the aggravating factor that's listed as B on your verdict sheet [c(4)(g)] for you to find this aggravating factor to be present, you must be satisfied that the defendant was committing or was fleeing after committing the crime of robbery, sexual assault, burglary, or kidnapping. The crimes must have occurred at times and places which were not substantially separate for this aggravating factor to be present.

In *State v. Parker*, 124 *N.J.* 628, 633, 592 *A.*2d 228 (1991) (quoting *Schad v. Arizona*, 501 U.S. 624, 631–33, 111 *S.Ct.* 2491, 2497, 115 *L.Ed.*2d 555, 565 (1991)), the Court observed that "there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." The Court recognized, though, that a specific unanimity instruction will be required when "a single crime can be proven by different theories based on different acts and . . . on different evidence. . . ." *Id.* at 635, 592 *A.*2d 228 (citing and quoting *People v. Melendez*, 224 *Cal.App.*3d 1420, 1433–34, 274 *Cal.Rptr.* 599, 608 (1990)). Citing *Parker, supra*, 124 *N.J.* at 637, 592 *A.*2d 228, the Court now acknowledges that "[a] specific unanimity instruction is required when the circumstances demonstrate a reasonable possibility that the jury will find one theory proven and the other not proven but that all of the jurors will not agree on that same theory." *Ante* at 563, 662 *A.*2d at 352. Under the rule of *Parker,* the Court would look to determine if the underlying allegations—robbery, burglary, kidnapping and sexual assault—"were contradictory or only

marginally related to each other and whether there was any tangible indication of jury confusion." *Parker, supra,* 124 *N.J.* at 639, 592 *A.*2d 228 (citing *United States v. Ryan,* 828 *F.*2d 1010, 1020 (3d Cir.1987)). Presumably, the Court finds in this case that the offenses serving as predicates to the c(4)(g) aggravating factor were neither contradictory nor only marginally related to one another.

In affirming the death sentence today, the Court notes that in the future, judges should in the penalty phase instruct jurors of the necessity to agree unanimously on a specific predicate felony in order to find an aggravating factor. *Ante* at 563, 662 *A.*2d at 352. The Court thus tacitly recognizes the error of failing to give a unanimity charge on the felony or felonies that constitute the c(4)(g) aggravating factor. The Court finds, nonetheless, that in this case the lack of a unanimity instruction is not reversible error because the jury convicted defendant of all of the predicate felonies in the guilt phase. *Ante* at 563, 662 *A.*2d at 352.

Such an analysis is too facile. Its flaw lies in the simplistic but false assumption that the finding of a fact in the guilt phase of a trial perfectly equates with a finding of that fact in the penalty phase. The former, the Court seems to believe, necessarily leads to the latter.

In my view, the conviction of a felony in the guilt phase, even when all the evidence unequivocally suggests that the felony was committed in the course of the murder, does not lead automatically to a finding of an aggravating factor predicated on that felony. There exists a fundamental difference in the deliberative quality of the two findings. The difference encompasses the distinct purposes that the guilt- and penalty-phase juries serve. The two deliberations are similar, though, at least in this: the jury must agree unanimously in order to convict a defendant of the felony in the guilt phase, and must again agree unanimously on the felony that underlies a finding of the aggravating factor. Therefore, the penalty phase jury must be specifically instructed that it can find

the aggravating factor only upon unanimous agreement on the underlying felony.

In *State v. Brown*, 138 *N.J.* 481, 576–86, 651 *A.*2d 19 (1994) (Handler, J., concurring and dissenting), I reviewed the principles that, I believe, require the giving of a specific unanimity instruction in the circumstances of that, and of this, case. We have recognized that juries in reaching ultimate verdicts perform a function far more embracive and nuanced than that of mere fact-finding. That special quality of the jury's function constitutes a fundamental part of the right to a trial by jury, a right which holds "a hallowed place" in the firmament of American law. *State v. Collier*, 90 *N.J.* 117, 122, 447 *A.*2d 168 (1982). The jury acts as "the conscience of the community" in our system of justice. *State v. Ingenito*, 87 *N.J.* 204, 212, 432 *A.*2d 912 (1981). We burden the jury with the responsibility of making the "paramount, exclusive and independent" adjudication of criminal guilt or innocence. *State v. Simon*, 79 *N.J.* 191, 199, 398 *A.*2d 861 (1979). In discharging that responsibility, the jury does not perform as a mere fact-finder, but rather more broadly finds the truth as expressed in its ultimate verdict. *Ingenito, supra*, 87 *N.J.* at 211, 432 *A.*2d 912. We understand that a jury's verdict in a criminal case transcends its fact-finding function. Thus, a jury may acquit even in the face of overwhelming evidence of guilt, *Simon, supra*, 79 *N.J.* at 208, 398 *A.*2d 861, or return inconsistent verdicts if they "accrue to the benefit of a defendant." *Ingenito, supra*, 87 *N.J.* at 212, 432 *A.*2d 912. A jury may also "nullify" a law by acquitting a defendant for some reason even though the jury may believe the defendant guilty beyond a reasonable doubt. *State v. Ragland*, 105 *N.J.* 189, 205, 519 *A.*2d 1361 (1986).

We thus recognize the moral dimension of jury verdicts. A defendant's right to a jury trial means that a defendant has the right to trial by a jury possessed of the fundamental power to exercise moral judgment in discharging its responsibility to determine ultimate criminal guilt or innocence. To dilute or diminish the jury's responsibility, therefore, violates a defendant's constitu-

tional right to a trial by jury. *See, e.g., Sandstrom v. Montana,* 442 *U.S.* 510, 516 n. 5, 99 *S.Ct.* 2450, 2455 n. 5, 61 *L.Ed.*2d 39, 46 n. 5 (1979) (holding that federal constitution bars directed verdicts against defendants in criminal cases regardless of strength of state's evidence); *State v. Coyle,* 119 *N.J.* 194, 574 *A.*2d 951 (1990) (ruling that sequential charge of successive crimes was improper because it can prevent jury from fully considering each charge); *Collier, supra,* 90 *N.J.* at 123, 447 *A.*2d 168 (invalidating rape conviction where trial court directed verdict on lesser charge of contributing to delinquency of a minor; noting that direction of verdict on lesser charge might "improperly imping[e] on the sensitive area of jury deliberation"); *Simon, supra,* 79 *N.J.* at 199–200, 398 *A.*2d 861 (ruling that piecemeal instructions, special interrogatories, and fragmented deliberations can result in "subtle coercion" and may undermine jury's capacity to determine ultimate criminal guilt or innocence).

By statute, the Legislature has extended the right to trial by jury to capital-sentencing proceedings. *N.J.S.A.* 2C:11–3c(1). All of the principles that define the duty of a jury and govern its deliberations, then, apply in full measure to the sentencing phase of this defendant's trial. A sentencing jury, like a guilt jury, bears the ultimate responsibility of decision. *N.J.S.A.* 2C:11–3c(3).

There is in the determination of criminal guilt a quality that cannot be measured simply as the sum of the facts that may add up to guilt. For that reason, every guilt determination must be singular and independent of any other determination of guilt and must be based only on the evidence that bears on it. In the ordinary run of cases in which a jury is called on to make successive determinations of guilt, we require the jury to consider from a fresh vantage point the evidence of guilt supporting a criminal conviction even though that same evidence was previously considered by that same jury in the prior criminal proceeding adjudicating another, albeit related, crime. *Ragland, supra,* 105 *N.J.* at 195, 519 *A.*2d 1361 (holding that to safeguard defendant's presumption of innocence on a second charge, "the jury [must] be

instructed in no uncertain terms to consider anew the evidence previously admitted but to disregard completely its prior verdict"); *Ingenito, supra,* 87 *N.J.* at 209, 432 *A.*2d 912 (same). It is even more imperative that such reconsideration be ensured in a capital-sentencing trial.

The decision to sentence a defendant to death vastly exceeds in intellectual and moral difficulty the determination of ultimate criminal guilt. *State v. Purnell,* 126 *N.J.* 518, 553, 601 *A.*2d 175 (1992) (Handler, J., concurring and dissenting). The extraordinary severity and irreversibility of the penalty command a heightened degree of care in the application of the principles of our law. *See, e.g., Lockett v. Ohio,* 438 *U.S.* 586, 605, 98 *S.Ct.* 2954, 2965, 57 *L.Ed.*2d 973, 990 (1978); *State v. Ramseur,* 106 *N.J.* 123, 316, 524 *A.*2d 188 (1987). Thus, the right to trial by jury at capital sentencing invokes protections greater even than those necessary to preserve the right to trial by jury on the issue of guilt.

If we require a jury to deliberate anew and scrupulously to reconsider evidence in a case in which a bifurcation separates two guilt determinations arising out of common evidence, *e.g., Ragland, supra,* 105 *N.J.* at 195, 519 *A.*2d 1361; *Ingenito, supra,* 87 *N.J.* at 209, 432 *A.*2d 912, we surely must insist that the jury reconsider evidence when a bifurcation separates a guilt from a capital-sentencing determination. In the former case, the jury considers the evidence again for its capacity to establish a particular element as it bears on criminal guilt, but in the latter, and instant, case, the decision on that element exists in a wholly new deliberative universe. Now, the larger deliberation does not aim to establish criminal guilt or innocence, but rather to judge whether the defendant shall live or die.

We cannot fully fathom or divine the deliberative dynamics of a jury's decision on whether to put a defendant to death. For that reason, even within the framework of substantive standards explained by clear instructions, we cannot deny a jury the decisional flexibility and freedom of conscience to examine anew the evidence previously considered and to resolve the facts to be found from

that evidence. The significance of this power to re-examine evidence previously considered by the jury inheres in part in the nature of the doubts that may have arisen.during the jury's earlier deliberation. A jury, therefore, must be allowed in a successive deliberation to revisit any lingering doubts and to give those doubts weight sufficient to spare the life of a defendant. *See Lockhart v. McCree,* 476 *U.S.* 162, 181, 106 *S.Ct.* 1758, 1769, 90 *L.Ed.*2d 137, 153 (1986); *Smith v. Balkcom,* 660 *F.*2d 573, 580–81 (5th Cir.1981) (applying Georgia law), *cert. denied* 459 *U.S.* 882, 103 *S.Ct.* 181, 74 *L.Ed.*2d 148 (1982). Many courts recognize that a jury's residual doubts about guilt of murder can properly affect its weighing of aggravating and mitigating factors in the ultimate life-or-death decision. *See, e.g., Andrews v. Collins,* 21 *F.*3d 612, 623, n. 21 (5th Cir.1994) (Texas); *Stringer v. Jackson,* 862 *F.*2d 1108, 1116 (5th Cir.1988) (approving counsel's strategy of arguing residual doubt to jury), *rev'd on other grounds sub nom. Stringer v. Black,* 503 *U.S.* 222, 112 *S.Ct.* 1130, 117 *L.Ed.*2d 367 (1992), *aff'd as modified,* 979 *F.*2d 38 (5th Cir.1992); *Rupe v. Wood,* 863 *F.Supp.* 1315, 1340 (W.D.Wash.1994); *People v. Johnson,* 3 *Cal.* 4th 1183, 14 *Cal.Rptr.*2d 702, 741–42, 842 *P.*2d 1, 40–41 (1992), *cert. denied* —— *U.S.* ——, 114 *S.Ct.* 114, 126 *L.Ed.*2d 80 (1993); *State v. Watson,* 61 *Ohio St.*3d 1, 572 *N.E.*2d 97, 111 (1991); *cf. Franklin v. Lynaugh,* 487 *U.S.* 164, 174, 108 *S.Ct.* 2320, 2327, 101 *L.Ed.*2d 155, 166 (1988) (ruling that no federal constitutional right exists to have jury consider residual doubts in mitigation of sentence). It follows that a jury's residual doubts about guilt of an underlying felony can properly affect the jury's decision about the existence of an aggravating factor dependent on that felony.

Defendant's sentencing jury, then, should have been required to reconsider the evidence of the charged felonies and to deliberate anew in the penalty phase about the existence of the felonies underlying the c(4)(g) aggravating factor. Most importantly, it should have been instructed to do so unencumbered by its prior determinations based on that evidence.

Aggravating factors must be found unanimously. *State v. Bey,* 112 *N.J.* 123, 159, 548 *A.*2d 887 (1988) (*Bey* II). After finding the existence of aggravating and mitigating factors, the jury must weigh those factors against one another. If a predicate crime is an element of the aggravating factor, jurors, obviously, may weigh one or more of the possible predicate crimes differently. It is, therefore, critically important that the jury be unanimous with respect to the underlying felony supporting the aggravating factor. Otherwise, as may have been the case here, jurors who convicted the defendant of all four possible underlying felonies may be tempted to weigh that factor cumulatively *i.e.,* give it extraordinary weight because they are mindful that four felonies fall within its ambit.

The Court, applying conventional plain-error doctrine, undertakes an independent examination of the record and purports to know what a properly instructed jury would have done. To presume to have such knowledge, the Court must assume that juries in the context of determining a life-or-death sentence undertake merely a fact-finding function. That, however, is not the case.

Even if we assume that the jury did properly deliberate anew, we must acknowledge that we have no way of knowing whether, in those deliberations, the jury unanimously found any of the possible predicate felonies. We know that every juror individually found the existence of *some* predicate felony, because the jury as a whole found the aggravating factor. But because the jury was not instructed on the necessity of unanimous agreement on a specific predicate felony, we cannot know whether in fact the jury did thus unanimously agree.

The majority, therefore, looks in vain to the guilt verdicts for guidance and support concerning the events of the penalty deliberation. There is none that enables it to use those verdicts simply to ratify defendant's death sentence. The Court, as noted, acknowledges that it is error not to give a specific unanimity charge in these circumstances. *Ante* at 563, 662 *A.*2d at 352. The

Court's finding of no plain error, relying on the fact of the guilt verdicts, is not defensible.

II

Substantial evidence was presented in this case to show that defendant suffered serious mental problems. The jury, however, failed to find either of the statutory mitigating circumstances that implicate such evidence. It did find certain catch-all circumstances involving mental impairment evidence but, contrary to the suggestion of the Court, those did not directly reflect his mental illness. *Ante* at 569–70, 662 *A*.2d at 355–56. Defendant attributes the jury's rejection of his mental impairment itself as a mitigating circumstance under the catch-all factor to the trial court's failure specifically to instruct the jury that it should reconsider evidence of mental impairment under the catch-all heading, even if that evidence proved insufficient to establish the statutory mental illness factors. He contends that the court's general instruction that the jury could consider anything in mitigation might not have communicated to it the knowledge that it could reconsider the mental illness evidence already rejected in connection with the determination of the statutory mitigating factors.

The Court rejects that argument, noting that the trial court did tell the jurors in general terms that they could consider any evidence as mitigating under the catch-all factor. *Ante* at 568–69, 662 *A*.2d at 355. I disagree, finding the general instructions inadequate.

Defense expert Dr. Arnaldo Apolito testified that defendant was not responsible for his actions at the time of the crimes. He diagnosed defendant as a chronic paranoid schizophrenic. Dr. Apolito testified that although defendant knew that society would judge his actions to be wrong, he felt they were "right." The State's expert, Dr. Azariah Eshkenazi, diagnosed defendant as having a schizoid personality disorder. He noted the careful planning that went into defendant's crimes, and the attempts

defendant made to conceal his identity, as evidence of defendant's knowledge of the consequences of his actions.

Uncontested and abundant evidence established defendant's deep emotional instability and disturbance. Defendant was quite literally born in prison to a mother then incarcerated at the New Jersey correctional facility in Clinton. As a newborn, he was given over to an aunt and uncle to raise. When that arrangement failed, defendant was uprooted and sent to live with his mother's aunt and her husband.

Defendant never had much contact with his mother, although she lived in nearby Paterson. He was, apparently, ashamed of his mother, who bore thirteen other children by five different fathers, and defendant was discouraged from having any relationship with her, as she was considered an outcast by the family. Defendant did not meet his father until he was eleven years old.

Defendant's abnormal behavior began early. School teachers suspected that defendant had severe emotional problems, and although they repeatedly suggested psychiatric evaluation, none was ever done. By the fifth grade, defendant had invented an imaginary friend. He soon began to hear the voice of an Indian Chief. Defendant also was accompanied by the spirit of a "Ninja Warrior" who required him to act with great secrecy in all his dealings. That "Ninja" spirit directed defendant to go to Asia, an assignment defendant performed by joining the United States Navy and requesting to serve in the Philippines. Defendant was granted a general discharge, although his service record describes him as a "complete misfit" with a provisional diagnosis of a schizoid disorder.

Defendant eventually landed a job in the Ridgewood post office where he was subject often to Postal Service discipline. He became convinced that he was being singled out for persecution because of his race. He believed that his co-workers deliberately spread germs near him in an attempt to make him sick. He took up karate and would occasionally come to work in combat fatigues and break into karate poses on the job. His supervisors at the

post office suggested that he seek psychiatric counseling. He refused. He was working at the post office when he was arrested for murders in Bergen County in 1991.

This evidence clearly relates to the c(5)(h) "catch-all" mitigating factor. The court delivered the following instruction on that factor:

> The fourth mitigating factor is listed as D on your verdict sheet says [sic] *any other factor* which is relevant to the defendant's character or record or to the circumstances of the offense.
>
> This is not really a single factor, rather it requires that you consider all of the evidence received as it relates to or concerns the defendant's life, his character, his characteristics or his record and the totality of the circumstances of the crime as well [as] the defendant's potential for rehabilitation.
>
> This list is non-inclusive and *mitigating factors other than those listed* may be found and considered whether or not the mitigating factors you find are listed on the jury verdict form. You will note that I have left space on this page for you to list *any other mitigating factors* that you may find to exist.
>
> &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;
>
> Now you may list *any other factor* which you find to be a mitigating factor, *any other factor* which you believe is relevant to the defendant's conduct, his character rather or his record or to the circumstances of the offense or *any other factor which has not been listed on the verdict sheet,* you're not to restricted [sic] or bound by those verdicts. (Emphasis added).

The Court today dismisses defendant's argument with the observation that the trial court told the jury that it could consider all of the evidence in assessing the c(5)(h) factor. *Ante* at 567, 662 A.2d at 354–55. At no time, though, did the court ever expressly inform the jury that it could consider, for the purposes of the catch-all factor, evidence it had previously considered and found insufficient or otherwise unpersuasive for the purpose of establishing one of the statutory mitigating factors. An explicit charge that specifically informs the jury that it should consider mental impairment evidence under c(5)(h) is required because otherwise jurors may assume that in rejecting the evidence in relation to the c(5)(a) and c(5)(d) factors they have exhausted the relevance of that evidence. Thus, although the trial court's instructions were correct, they did not and could not alleviate the jury's tendency to assume that it had already considered the mental impairment

evidence. Thus, as noted by defendant, although the phrase "any other factor," was repeatedly used, the jury could understand that phrase to mean only any other factor *that you have not already considered and rejected.*

This Court indirectly acknowledged the significance of concerns about the interplay between the catch-all factor and the statutory mental state mitigating factors in *State v. Martini,* 131 *N.J.* 176, 300–08, 619 *A.*2d 1208 (1993). There, the Court rejected the argument that a trial judge's instruction emphasizing the qualifying language in factors c(5)(a) ("extreme") and c(5)(d) ("significant") created an impermissible barrier to the weighing of relevant mitigating evidence of the defendant's mental impairments. However, the charge given in *Martini* differs significantly enough from the charge given here to warrant a different result. The charge given by the trial court in *Martini* more explicitly directs the jury to consider *anything,* including evidence perhaps already considered under a statutory factor. Thus, it is apparent that the jury there understood that it could reconsider evidence. The *Martini* charge included the following as part of the trial court's charge on the c(5)(h) factor:

> All mitigating evidence is to be considered by you, whether it appears during the first part of the trial from witnesses called by the State or the defense, and from the physical evidence, or it appears during this phase of the trial from the evidence produced by either side, *or any mitigating factor that you see present.*

*Id.* at 306, 619 *A.*2d 1208. (emphasis added). That last phrase "or any mitigating factor you see present" indicates to the jury that it can use evidence bearing on other mitigating factors as part of its catch-all consideration. Defense counsel in *Martini* also informed the jury that "[e]ven if you had the slightest little doubt during the course of your deliberations on the first trial you can take into consideration and utilize those [factors]." *Ibid.*

The Court determined in *Martini* that there was "no reasonable likelihood that the jury had applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.* at 304, 619 *A.*2d 1208 (quoting *Boyde v. California,* 494 *U.S.* 370, 380, 110 *S.Ct.* 1190, 1198, 108 *L.Ed.*2d 316, 329

(1990)). The Court's determination rested in part on the fact that with respect to the catch-all factor, the jury was instructed that it should consider all of the evidence. *Id.* at 305, 619 *A.*2d 1208. Nevertheless, the Court noted the "desirability of more precise instructions that would clarify even further the scope and function of those mitigating factors." *Id.* at 307, 619 *A.*2d 1208 (quoting *State v. Marshall,* 123 *N.J.* 1, 147–48, 586 *A.*2d 85 (1991)).

*Amicus* cites *Martini* as establishing that a general "you may use all evidence" instruction suffices to inform the jury of how to use the mental impairment evidence under c(5)(h). I disagree. In response to *Martini,* the *Judges Bench Manual for Capital Causes* proposed an explicit instruction concerning the reconsideration of mental impairment evidence under c(5)(h). *See Judge's Bench Manual for Capital Causes,* Appendix J25–26 ("However, if the mental or emotional disturbance was present but not extreme, you may still consider such lesser disturbance under mitigating factor (h) . . .").

The jurors understood that they could consider all evidence from any part of the trial in their c(5)(h) determination. However, there is reason to doubt that jurors would understand, without explicit instruction, that they could reconsider evidence of mental impairment that they previously concluded did not rise to a level sufficient to establish a statutory mitigating factor. It assumes too much to suggest that the jury, without explicit instruction, would be able to fathom the differences between finding that defendant's mental impairments constituted mitigation under c(5)(a) or c(5)(d) and finding mitigation on the same evidence under c(5)(h).

In *Jeffers v. Lewis,* 974 *F.*2d 1075 (9th Cir.1992), the court considered a situation analogous to the case at bar. The court noted that the trial court failed to direct the jury to consider such evidence of psychological impairment that did not meet the statutory requirement of "significant impairment" as a non-statutory mitigating circumstance. *Id.* at 1078. The court ruled that "[b]ecause there is a risk that mitigating evidence in this case was

not fully considered, Jeffers' sentence of death cannot stand." *Id.* at 1084. The court, citing *Smith v. McCormick*, 914 *F.*2d 1153, 1166 (9th Cir.1990) (holding that mitigating evidence of mental impairment could not be excluded from penalty phase of capital trial simply because it was not sufficiently substantial to meet state statutory requirement), noted that it is "not permitted to presume that because evidence was admitted before the factfinder, it was necessarily given consideration." *Id.* at 1079 (quoting *Smith, supra,* 914 *F.*2d at 1166).

"The catch-all factor acts as a safety net, and in order for it to function properly, specific instructions are required." *Martini, supra,* 131 *N.J.* at 357, 619 *A.*2d 1208 (Handler, J., dissenting). As in *Martini,* here I believe that "the failure of the trial court to instruct specifically that the jury could consider non-extreme mental or emotional disturbance ... under the catch-all factor," even though that evidence had been previously considered by the jury, "created a 'reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.'" *Id.* at 359, 619 *A.*2d 1208 (quoting *Boyde, supra,* 494 *U.S.* at 380, 110 *S.Ct.* at 1198, 108 *L.Ed.*2d at 329).

The charge and arguments at issue in this case, as noted above, repeatedly used the potentially confusing reference to "any other factor." A passage from a portion of the trial court's instruction to the jury is illustrative:

> ... [T]his factor is in fact an invitation by the legislature for you to use your good judgment, your openness and your compassion to determine whether there are one or more factors *that are not specifically asserted by the defendant or listed by the legislature* as mitigating factors present in this case.

The tenor of that instruction is to focus the jury on issues and evidence *not already addressed* by the statute or defendant. Because mental impairment is explicitly addressed by the statute, the impression that the issue is to be analyzed only in connection with the statutory factors is quite plausible.

That kind of shortcoming—an inadequate jury instruction—cannot, in my opinion, be overcome or rectified by arguments or

closing statements of counsel. *See, e.g., Marshall, supra*, 123 *N.J.* 1, 246, 586 *A.*2d 85 (1991) (Handler, J., dissenting). In any event, counsel's efforts were totally unavailing. Defense counsel's summation included a reference to the psychiatric testimony. He focused the jury's attention on the "defendant's emotional and mental state in determining whether there was any evidence that defendant suffered *a mental or emotional disturbance or had diminished capacity due to mental disease or defect.*" Defense counsel's language was tightly tied to the language of the c(5)(a) ("extreme emotional disturbance") and c(5)(d) (significant impairment) mitigating factors.

Finally, defense counsel advised the jury:

And there are, there may be *mitigating factors that I haven't even discussed* that you as jurors may feel are appropriate.

\* \* \* \* \* \* \* \*

... [W]rite down any mitigating factor that you feel is appropriate, that you feel there's something in Joseph Harris' background which allows you to find a mitigating factor, *even though I didn't discuss it, even though it's not mentioned* ...

But having thus directed the jury to the psychiatric evidence, defense counsel failed to request that the jury be instructed explicitly that it could give that evidence mitigating weight under the c(5)(h) factor. Here, the jury was instructed to consider issues that were not addressed, but was not directed to reconsider evidence already examined.

It cannot be overemphasized that the point to be conveyed to the jury is complex. The jury must understand that though it has considered and rejected the mental impairment evidence as it relates to the c(5)(a) and c(5)(d) factors, it is nonetheless free to reconsider that evidence under the c(5)(h) factor.

Finally, one cannot fail to be troubled by the fact that this jury, when considering the c(5)(h) factor, did not find any mitigation resulting from this defendant's obvious mental problems. The Court proposes, *ante* at 567–68, 662 *A.*2d at 354–55, that certain of the circumstances found under c(5)(h) do reflect the psychiatric evidence. I disagree. Defendant may not have been legally

insane. He may not have suffered an "extreme emotional distur-
bance" at the time of his crime. His capacity to conform his
conduct may not have been "significantly impaired." But he was,
indisputably, a seriously disturbed individual.

The failure to give a specific instruction constitutes reversible
error when one considers the weight of the evidence of mental
impairment. The jury's failure to find any mitigating factor may
be attributed to the fact that the jury likely did not understand
that it could find the evidence of mental illness to constitute a non-
statutory mitigating factor even if it did not find that evidence
sufficient to establish a statutory factor.

The importance of evidence related to a capital defendant's
mental condition is obvious. This Court itself has recognized that
mental illness is a recurrent and troubling characteristic of many
death-sentenced defendants in New Jersey. *State v. Zola*, 112
*N.J.* 384, 437, 548 *A.*2d 1022 (1988). One statistical study notes an
alarming prevalence of mental illness among New Jersey's capital
defendants. Leigh B. Bienen, et al. *The Reimposition of Capital
Punishment in New Jersey: The Role of Prosecutorial Discre-
tion*, 41 *Rutgers L.Rev.* 1 (1988). *See also* Andrew L. Shapiro, *An
Insane Execution*, N.Y. Times, May 11, 1995, at A29 (reporting
imminent execution of insane capital defendant in Alabama).
*Martini* itself underscores the importance of mental impairment
evidence and its direct bearing on deathworthiness. Moreover,
this Court has already noted the difficulties jurors have with
psychiatric evidence. *State v. Moore*, 122 *N.J.* 420, 453–54, 585
*A.*2d 864 (1991).

As is clear from the *voir dire* in this case, concerns about the
jurors' willingness to accept legitimate psychiatric testimony were
evident throughout the case. This jury faced four critical ques-
tions involving psychiatric testimony: (1) whether defendant's
mental condition met the requirements of the insanity defense; (2)
whether his mental condition met the requirements of diminished
capacity; (3) whether his mental condition satisfied the require-
ments of c(5)(a) and/or c(5)(d); and (4) whether there was any

mitigation to be found at all in defendant's mental condition under c(5)(h). Before getting to question four, this jury could well have felt that it was done with defendant's mental condition. In my opinion, the jury needed an explicit instruction that explained the fourth use for mental impairment evidence under the Capital Murder Act.

The evidence is replete with indications of defendant's mental instability, yet the jury found no mental impairment mitigation. The failure explicitly to charge the jury regarding its obligation to reconsider the mental impairment evidence under c(5)(h) could reasonably have affected the outcome of this case.

### III

Defendant argues that the jury should have been instructed that if credible evidence of a statutory mitigating factor exists, then the jury must find that factor. Under the circumstances, I agree. The Court disposes of this claim by referring to *N.J.S.A.* 2C:11–3c(2)(a), which provides that the defendant bears the burden of production, but not of proof, with respect to the mitigating factors. *Ante* at 565, 662 *A.*2d at 353.

The existence of at least some mitigating factors (such as that referring to a lack of prior criminal history) do not implicate the qualitative judgment of the jury. I believe that a court must, in a proper case, instruct the jury that it must find such a factor when the evidence of its existence is uncontested. The existence of other factors, though, may demand of the jury a qualitative judgment, and thus a court may not instruct the jury to find these. Once a jury has found that a mitigating factor exists, it must go on to evaluate the relative weight of that factor in the ultimate determination. The court may never instruct the jury as to the weight of a factor, but it may, I believe, instruct a jury that a factor exists and should be found when the evidence incontestably establishes the facts underlying the factor.

Concededly, there is a distinction among factors according to the degree to which their existence is obvious. Thus, the youth of

an 18–year old or the lack of a·criminal history of an altar-boy defendant is obvious in a sense that extreme emotional disturbance rarely is. But the fact that we can usually only with difficulty decide whether an extreme emotional disturbance exists does not make the fact of its existence, in an appropriate case, any less sure. In other words, extreme emotional disturbance, I submit, can exist just as objectively as youth, such that the finding of the existence of extreme emotional disturbance does not involve a "qualitative" judgment any more than does a finding about age or criminal history. The findings are distinct only in the difficulty of the discovery of the objective fact.

I thus disagree with the Court that a trial court could never direct a jury to find the emotional disturbance factor. There can be a case of disturbance so obvious that a court should direct the finding.

## IV

For the reasons expressed, I conclude that defendant's death sentence is invalid, and, therefore, I dissent from the Court's judgment affirming defendant's death sentence.

*For affirmance*—Chief Justice WILENTZ and Justices POLLOCK, O'HERN, GARIBALDI, and STEIN—5.

*For affirmance in part; reversal in part*—Justice HANDLER—1.